## RANDOLPH, Plaintiff, v. FIRST BAPTIST CHURCH OF LOCKLAND et, Defendants.

Common Pleas Court, Hamilton County.

No. A-134017.   Decided April 6, 1954.

Myron S. Rudd, Cincinnati, for plaintiff.
John A. Wiethe, Cincinnati, for defendant.

**OPINION**

By RENNER, J.

Immediately after the court had announced its decision, a verbal motion was made by counsel for the defendant, The First Baptist Church of Lockland, for separate findings of fact and conclusions of law, at which time they advised the court that they also wished to submit certain written interrogatories in connection therewith. Thereafter a written motion for separate findings of fact and conclusions of law and answers to interrogatories were filed. Plaintiff then filed objections to this motion, which objections were heard by the court and are considered and determined herein.

Coming now to consider the general findings of fact requested, the court finds:

That the First Baptist Church of Lockland, Hamilton county, Ohio, also known as The Lockland Baptist Church, is an Ohio corporation not for profit;

That Mary Randolph, the plaintiff, was a member of this church at the time of the attempted expulsion of her by the membership of the church on August 7, 1952, and had been a member for approximately fifteen years prior to that time;

That a Constitution (Exhibit No. 1) was adopted by the membership of the defendant church on February 2nd, 1951, which was replaced by a new Constitution (Exhibit No. 2) adopted by the membership at the regular business meeting of the members on August 7, 1952, immediately prior to the attempted expulsion of Mary Randolph;

That Nola Loggains and Sherman Waddell, members of the defendant church, visited plaintiff's home in the early part of February 1952 and they discussed with plaintiff her husband's, her son's and her absence from Sunday School and her attitude, and that of others, towards the church;

That Escar Dalton, chairman of the board of deacons, visited with the plaintiff in March 1952 and also talked to plaintiff about her absence from church, the church program and her attitude, and that of others towards the church;

That on the two Sundays preceding Thursday, August 7, 1952, the Reverend John Rawlings announced that the church would withdraw the hand of fellowship from certain belligerent people, without naming them, who had opposed the advancement of the program of the church;

That at the special meeting of July 17, 1952, the Reverend John Rawlings announced "that in our next business meeting, on August 7th, that certain members, whom the deacons had talked to and were trying to reconcile with the majority of

the body of the church, if reconciliation was not made, that we would withdraw the hand of fellowship from the group of them," again without naming the individuals;

That at the meeting of August 7, 1952, as the next order of business, immediately after the adoption of the new Constitution, a recommendation of the deacons (Exhibit No. 4) which was dated that same day (August 7, 1952) was read. A motion was then duly made, seconded and carried that the recommendation of the deacons be concurred in and fellowship be withdrawn from those named in the recommendation; (Exhibit No. 3.)

That at no time prior to the submission of this recommendation at the regular business meeting of the members on August 7, 1952, was Mary Randolph specifically mentioned by name as one of the persons to be dealt with, nor was she notified, orally or in writing, that she was one of those to be dealt with;

That Mary Randoph was at the July 17, 1952, special business meeting, but was not present at the August 7, 1952 regular business meeting;

That at no time prior to the meeting of August 7, 1952, was Mary Randolph furnished with any information or specification of charges by the church, by its membership or by any officer or any member of the church;

That Mary Randolph received no noticce in advance of the August 7th meeting that she was one of the persons who was to be dealt with at the August 7th, 1952, meeting;

That each of the Constitutions (Exhibits No. 1 and 2) contains the following introduction or preamble;

"Since we believe that the local Church is a Democratic Body, and that it is to do all things decently and in order, and order of the government of the body so that its members may better understand their duty, rights and responsibilities, and believing that it will promote harmony and good-will; we have therefore adopted this constitution."

That Article X of the old Constitution (Exhibit 1) reads as follows:

"ARTICLE X—DISCIPLINE

"SECTION I—The sole power of discipline shall be vested in the Church. Members shall be excluded from the membership of the Church upon a sufficient evidence of gross sin and failure to repent thereof.

"SECTION II—No member shall be excluded from the membership of the Church without the privilege of a fair and impartial investigation and trial. Such action shall be according

to Matt. 18: 15-17. (Moreover if thy brother shall trespass against thee, go tell him his fault between thee and him alone; if he shall hear thee, thou hast gained thy brother. But if he will not hear thee, then take with thee one or two more, that in the mouth of two or three witnesses every word may be establsihed. And if he shall neglect to hear them, tell it unto the Church; but if he neglect to hear the Church, let him be unto thee as an heathen man and a publican."

That Article X of the new Constitution (Exhibit 2) reads as follows:

### "ARTICLE X—DISCIPLINE

"SECTION I—The sole power of discipline shall bé vested in the church. Members shall be excluded from the membership of the church for conduct unbecoming a Christian.

"SECTION II—No member shall be excluded from the membership of the church without the privilege of a fair and impartial investigation and hearing. Such investigation shall be conducted by the board of deacons and pastor, and reported to the church."

On the hearing of the demurrer to the petition and throughout the trial of this case counsel for defendant, The First Baptist Church of Lockland, have consistently urged that the court has no jurisdiction of the subject of this action.

One reason advanced is the constitutional restrictions pertaining to the separation of church and state. There are many instances in which this rule has been invoked. That it has no application to the facts in this case at bar is shown by numerous decisions. throughout the United States in which the civil courts have granted relief in church controversies of various kinds and the court deems it unnecessary to discuss this contention any further.

The other argument advanced and urged strenuously was that courts of equity lack jurisdiction in church expulsion cases.

In support of this contention a number of authorities were cited in the memorandum attached to defendant's demurrer where relief was denied by the courts. The following is a general summary of the theories advanced by the courts in these cases, viz: that churches, such as the defendant Baptist Church, have an independent or congregational form of government in which the body is self-governing, each single church administering its own government; that as such it is a pure democracy and it is the duty of the minority to submit to the expressed will of the majority; that questions of faith and practice of the church and its members belong to the

church judicatories to which members voluntarily submit themselves, and, however much they are dissatisfied with the exercise of that jurisdiction they have no right to invoke the supervisory power of civil courts, so long as their civil or property rights are not involved; that a church may make rules for expulsion or excommunication of its members and such rules are binding on its members; that the relations of a member to his church are not contractual but pertain only to spiritual affairs and the courts are without jurisdiction by mandamus or otherwise to annul proceedings expelling members; that membership in a church does not constitute a civil or property right; that churches stand upon a different and higher plane than other voluntary societies formed for business, social, literary or charitable purposes, and that the right of a church to decide for itself who shall be expelled or excluded cannot be questioned by the courts when no civil or property rights are involved, even though such proceedings are irregular and contrary to and in violation of the provisions of the church constitution, rules and regulations controlling such proceedings.

That the defendant church, and other Baptist churches like it, are autonomous, and that the minority must submit to the majority is universally recognized. But does it follow that such bodies, therefore, may expel members with entire disregard of unequivocal constitutional provisions governing expulsion from membership? This seems to be the crux of the present action.

Many courts, recognizing such democratic form of church organization and, although finding that the methods used were irregular and in violation of constitutional provisions, nevertheless have denied relief to expelled members. The basic reason usually assign for such action is that membership in a church does not constitute a civil or property right and, therefore, that civil courts are not competent to question or review church action in expelling members where no such rights are involved.

But nowhere is any basis presented for the dogmatic conclusion that expulsion from a church does not involve civil or property rights. Inherent in memberships in churches, or any other non-profit incorporated or unincorporated organizations and societies is the right to a share of the organization's properties. Even though the chance of a division of the net assets of the organization is very remote and the value of such interest may be limited, a property right does exist.

That such property right in memberships in organizations

not for profit, incorporated and unincorporated, does exist and is universally recognized by courts, is shown by the many cases involving the right to church properties between warring factions of the church. Actions for relief in such instances are usually brought by a minority group of members of the church. Very seldom have courts refused to accept jurisdiction in such controversies. The right to institute such actions emanates from the membership of each of those constituting the group. Here is a clearly and universally recognized right of property in membership. How or why it is lost to a member who may be named for expulsion has not been satisfactorily explained.

In some instances, the theory that there is no civil or property right inherent in membership is the only reason assigned. In others, the courts have resorted to other doctrines or philosophies to lend aid or support to their unconvincing pronouncements that civil or property rights do not exist.

Typical of these supporting declarations are found in the cases above referred to which were cited by defendants viz.:

Thomas v. Lewis, 224 Ky., 307 (cited by defendant), holding that Baptist and other churches have an independent or congregational form of government, are self-governing, each church administering its own government; and

Mitchell v. Church of Christ, 221 Ala., 315 (cited by defendant), holding that each Baptist church is within itself a pure democracy and that it is the duty of the minority to submit to the expressed will of the majority.

The fact that such churches are so constituted certainly should not grant to them the unbridled right to disregard and to violate the provisions of their own written by-laws or constitutions; nor in the absence of a constitution or by-laws to deal with the rights of minorities in a manner repugnant to democratic and common law principles.

In Minton v. Leavell, et al., 297 S. W., 615 (cited by defendant), to support the no-civil-or-property-rights theory in an expulsion case the court advances another principle, viz.: that membership in a church creates a different relationship from that which exists in other voluntary societies formed for business, social, literary or charitable purposes; that it stands upon a different and higher plane and that the right of a church to decide for itself who may be expelled from its fold cannot be questioned by courts when no civil or property rights are involved, even though the proceedings are irregular.

What is the basis or logic for such legal principles or theories which sanction and condone irregular practices because the practitioners are found in a high level classification? We must not lose sight of the fact that church memberships are made

up of lay people as are the memberships of other societies, and as such they are subject to the same human frailties and weaknesses.

Strict adherence by courts to such doctrines would make it possible for a self-willed minority group to gain control of all of the properties of the church by indirection when it could not be accomplished by direct action. By arbitrary expulsion of members, such a minority group could establish complete control of membership, if the courts are without jurisdiction to require that such expulsion be in conformity with the adopted constitution of the church.

Counsel for defendant urge that this court's decision is novel and new and is not supported by legal precedent. While it is true that the doctrines hereinbefore discussed are still followed in some jurisdictions, other courts have diverged from these and have adopted what earlier in this century has been referred to by some legal authorities as the modern view, and have granted relief in expulsion cases.

In granting relief some have done so on the theory of a limited property right in the membership in the church. Other courts have moved entirely away from this theory, recognizing the right of courts of equity to entertain jurisdiction because of the humiliation and hurt to personality, the injury to character, reputation, feelings and personal rights and human dignity.

Earlier in this century, and while the departure from the older rule which denied recourse to the civil courts in expulsions was slowly developing pertinent articles by authors of renown appeared in a number of legal periodicals. The origin of the old rule and its weaknesses were discussed and criticized and the need for a better protection of interests of personality was emphasized.

Roscoe Pound, who became Dean of the Harvard Law School in 1916 wrote an article "Interests in Personality" which was published in 28 Harvard Law Review 343. His profound articles on various branches of the law, and his reputation as an authority on law, are well recognized and often quoted by the courts. This article, which was published in 1915, traces the growth, development, and broadening of legislation and the judicial system to meet the ever increasing demands of individuals upon government. A year later, April 1916. another article by the same author, "Equitable Relief Against Defamation and Injuries to Personality" appeared in 29 Harvard Law Review 640. Dean Pound opens this article with the following paragraphs:

"The hesitation if not downright refusal, of American law to allow preventive remedies in order to secure interests of personality, where redress by way of damages is often obviously inadequate or even wholly inapplicable, has frequently been criticized. Reading the American cases on this point, one may recall the words of Mr. Justice Holmes upon the subject of trespass ab initio:

" 'It is revolting to have no better reason for a rule of law than that it was laid down in the reign of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since and the rule simply persists from blind imitation of the past.' "

At page 670 the following appears:

"In a note to Chappel v. Stewart, which has frequently been quoted, the doctrine of that case is vigorously criticized. The editor says that the proposition announced 'taken literally and in its full meaning would make the system of equity suitable only to a semi-savage society which has much respect for property but little for life.' " He adds:

" 'Our equity jurisprudence does not quite deserve so severe a reproach. It does, indeed, do much for the protection of personal rights, although it has not been willing to acknowledge the fact, but has persisted in declaring the contrary.' "

And further, at page 672, it is stated:

"* * * a third no less significant may be added, namely, the cases of wrongful expulsion from social clubs where the real wrong complained of is the humiliation and injury to feelings. Here, as we shall see presently courts of equity generally insist upon some shadow of a property interest, however trivial; actually protecting the feelings, but purporting to protect only the pocketbook. The analogy to what we have seen taking place in the cases as to defamation and disparagement of property is suggestive. In each case the courts protest that the law is unchanged. The old doctrine is announced with conviction. But its whole spirit is rejected and in the result it is evaded. Something is found which gives the camel's nose legitimate standing in the chancellor's tent, and the whole beast follows in order to dispose of the case completely. Such devices never obtain except when dealing with a moribund rule."

In the article appearing in 34 Harvard Law Review, page 388 (1919-1920) "Progress of the Law, Equitable Relief against Torts" Zechariah Chafee, Jr., who published a number of recognized works, one of which is "Cases on Equitable Relief Against Torts," at page 407 states:

"The first determined onslaught on the oft-repeated doctrine that equity protects only rights of property was made by Louis D. Brandeis and Samuel D. Warren in the pages of this Review thirty years ago. A quarter of a century afterwards an article by Dean Pound renewed the attack on a still broader front. Each year brings increasing evidence that their views will eventually be accepted by courts and legislatures. The law courts from early times have protected interests of personality, for example, by actions of slander and libel. What rational principle forbids the application to such rights of the familiar rule that if there is a remedy at law which is inadequate, then equity gives relief, unless special considerations restrain the exercise of its jurisdiction?

"The extension of equitable jurisdiction for the protection of human dignity and peace of mind has been made much easier through the ever widening meaning attached to the conception of property. The gulf between an acre of land and the right of privacy may have been too broad for equity to bridge but its jurisdiction over property has now extended from land and chattels to far more intangible human interests."

In another article published in May 1930, 43 Harvard Law Review, 993, "The Internal Affairs of Associations Not For Profit," again by Zechariah Chafee, Jr. we find the following expressions at page 998, after referring to wrongful expulsion cases:

"When we turn aside from the authorities and consider the actual human interests which suffer from an expulsion, it becomes apparent that in many cases they are chiefly interests of personality. The expelled club member finds his social reputation blasted, and is likely to be blackballed by other desirable clubs. The former trade unionist is ostracized by union members. A student like Shelley who has been excluded from college is branded for years to come, and deprived of intimate associations with places and companions. Excommunication from a church means loss of the opportunity to worship God in familiar surroundings with a cherished ritual, and inflicts upon the devout believer loneliness of spirit and perhaps the dread of eternal damnation. In comparison with such emotional deprivations, mere losses of property often appear trivial. It would seem natural that courts of equity should consider the desirability of remedying such injuries to personality, but they are hindered from doing so by the oft-repeated doctrine that equity protects only property rights. Dean Pound and others have shown the unsubstantial basis of this doctrine in the older cases, and its unfortunate effect

in restricting the ability of courts to remedy many of the evils of modern life. Injunctions and similar flexible remedies of equity are much better suited than a speculative action for damages to protect interests of personality when the injuries to them are sufficiently serious to warrant the interference of the courts. The trend of the decisions today is toward such protection, even in the courts of last resort, and an examination of unreported cases in the lower courts collected from newspapers indicates that such courts are willing to go farther than the appellate judges in frankly protecting interests of personality. Such press items are also significant to show the frequency with which citizens are now seeking equitable remedies against this kind of injury. Law in action is breaking away from the property limitation which still receives much sanction from law in books. In spite of these modern tendencies, however, the time has not yet arrived when we can expect courts of equity to look squarely at the interests of personality involved in expulsions from associations, and we are still obliged to seek the basis of relief elsewhere."

And, at page 1008:

"Sometimes the relations, unlike membership in business corporations and partnerships, may involve only interests of personality, but the courts should still consider whether justice and policy require them to protect it. For a time, under the influence of the traditional limitation of equitable jurisdiction to interests of substance, the courts are likely to continue to insist on finding some property element in the relation before they will prevent its destruction, but this tradition will probably die out soon."

That courts have moved away from the theory of non-interference except in cases in which property rights are involved and that equity will grant relief in expulsion cases is shown by many reported cases in the United States.

In Ohio, the Circuit Court of Fulton County, Munsel v. Boyd, 10 C. C. (N. S.) 121 (decided May 11, 1907), granted relief to expelled members of a church. Syllabus 4 of this case reads as follows:

"The fact that members of a church have become dissatisfied with the pastor, and disapprove of the control into which the church has fallen and cease to attend its services, does not afford ground, without some rule or law of the church therefor, for their dismissal or expulsion without notice or an opportunity to appear and defend; and a vote of expulsion under such circumstances does not terminate membership."

An older case decided in 1884, and which has been cited

numerous times, is Gray v. Christian Society, et al, 137 Mass. Reports, 329. The opinion in this case was written by Oliver Wendel Holmes, then an Associate Justice of the Supreme Court of Massachusetts and who later became an Associate Justice of the Supreme Court of the United States. It is unnecessary to comment further upon his qualifications and high standing as a lawyer, author, professor of law and jurist. At page 331 of its opinion the court had this to say:

"But, again, the grounds on which a member is to be deprived of his membership are both of them indefinite, involving questions of, more or less, possible disputes of fact, and certain differences of judgment. Not only is the number of times a man has attended, or the amount he has contributed, to be settled, but then comes the question whether the facts amount to ceasing regularly to worship with the society, or to a substantial failure to contribute. These questions are not to be decided by a moderator when a person offers his vote. They are judicial questions, to be determined by the society, after giving the member notice and an opportunity to be heard. The necessity of complying with these requirements of common justice has been so uniformly asserted, that only a few cases need be cited in addition to those last referred to, to show how unwilling courts have been to admit that charters, by-laws, or rules could be intended to deprive a man of his membership without a hearing. Dean v. Bennett, L. R. 6 Ch. 489. Fisher v. Keane, 11 Ch. D. 353, 359. Queen v. Saddlers' Co. 10 H. L. Cas. 404. Innes v. Wylie, 1 Car. & K. 257, 263. State v. Adams, 44 Mo. 570, 586.

"As there had been no hearing, and no vote of the society that their names should be dropped from the list, the persons who were prevented from voting were wrongfully prevented."

Berrien v. Pollitzer, et al (decided December 15, 1947, by the United States Court of Appeals for the District of Columbia) 165 Fed. Rep. (2d) p. 21, is a complete departure from the old rule, syllabus 1 and 2 of which read:

"Equity jurisdiction is not limited to the protection of property rights and may be invoked for protection of personal rights.

"District court has jurisdiction to grant injunction against exclusion of plaintiff and similarly situated members of the National Woman's Party from the party's headquarters."

The case was originally tried in the District Court of the District of Columbia and after a hearing on a motion for a preliminary injunction, the complaint was dismissed on the

ground that the court had no jurisdiction to grant an injunction because it could interfere only to protect property rights. The Court of Appeals held that the District Court erred in its decision. The court in its opinion on page 22 says:

"The doctrine that equity jurisdiction is limited to the protection of property rights conflicts with the familiar principle that equity may give preventive relief when the legal remedy of money damages, if available at all, is inadequate to redress a wrong. Obviously money has little in common with such personal rights or interests as reputation, domestic relations, or membership in nonprofit organizations. Money, one form of property, has much more in common with other forms of property. Invasions of personal interests are accordingly less capable of translation into money terms than invasions of property interests. No one can seriously contend that money is an adequate remedy for all sorts of personal wrongs. Clearly 'injunctions and similar flexible remedies of equity are much better suited than a speculative action for damages to protect interests of personality * * *.'

" 'The tradition that equity protects only property rights has been traced to a dictum of Lord Eldon which was not only unnecessary but contrary to the decision which evoked it. The decision was that a defendant should be restrained by injunction from publishing personal letters which the plaintiff had written to him. Dean Pound has pointed out that the real injury in Gee v. Pritchard was an invasion of the right of privacy. In result therefore, a case in which we are told that equity has no jurisdiction to secure interests of personality, and the case always cited since for that proposition, was a pioneer decision finding a way for securing the then unknown right of privacy * * *. Property which had no value as property * * * was a mere formal peg on which to hang the substantial relief.'

" 'Law in action is breaking away from the property limitation which still receives much sanction from law in books.' Even in books, the limitation has begun to lose ground. Judge Qua, for the Supreme Judicial Court of Massachusetts, has just reviewed the subject in a distinguished opinion from which we quote. 'In reading the decisions holding or stating that equity will protect only property rights, one is struck by the absence of any convincing reasons * * *. We cannot believe that personal rights recognized by law are in general less important to the individual or less vital to society or less worthy of protection by the peculiar remedies equity can afford than are property rights. * * * We believe the true rule to be that equity

will protect personal rights by injunction upon the same conditions upon which it will protect property rights by injunction. * * * A number of courts have tended toward this view. Legal writers support it. There is no such body of authority opposed to it in this (jurisdiction) as to preclude its adoption here.'

"Even thirty years ago, when Dean Pound published his article on Equitable Relief Against Defamation and Injuries to Personality, there were a few classes of cases in which the property limitation, though often respected in form, was disregarded in substance. One such class involved 'wrongful expulsion from social clubs where the real wrong complained of is the humiliation and injury to feelings. Here * * * the courts of equity generally insist upon some shadow of a property interest, however trivial; actually protecting the feelings, but purporting to protect only the pocketbook * * *. Something is found which gives the camel's nose legitimate standing in the chancellor's tent, and the whole beast follows in order to dispose of the case completely. Such devices never obtain except when we are dealing with a moribund rule * * *.' 'It seems plain that the club member's interests of personality should be the object of consideration regardless of the nature of the club, and that the real question is whether the injury to these interests is sufficiently serious to warrant judicial interference with the internal affairs of a social organization The court's willingness to decide this fundamental question ought not to depend on the presence or absence of an insignificant interest in club property * * *. The member's relation to the association is the true subject matter of protection '

"Approximately this view has long been enforced, if not distinctly expressed, in some jurisdictions including the District of Columbia. A plaintiff expelled from a corporation or association not organized for profit need not show that he has even a nominal property interest to protect. Fifty years ago this court recognized that if a member of an incorporated club were expelled without a 'regularly conducted' trial, on due notice, by 'constituted corporate authorities,' and a 'judgment arrived at * * * in good faith,' specific relief could be granted. Relief was denied solely because the club had met those requirements. The case contains no suggestion that a property right is necessary. Some years later we squarely held that a property right is not necessary. Though courts are sometimes reluctant to interfere in the internal affairs of churches, we held that a member expelled from a church in violation of its procedural rules was entitled to relief in equity, and we

pointed out that 'no temporal rights' of the member were involved.

"It is obviously immaterial that the National Woman's Party is called a party and not a club or a church.

"Appellees suggest that appellant has not been expelled. We think the resolution purports to expel her, but we also think it immaterial to the court's jurisdiction whether she has been expelled from membership or merely excluded from a member's essential privilege of using the Party's quarters. She has been excluded without a 'regularly conducted' trial, on due notice, by 'constituted corporate authorities,' and a 'judgment arrived at * * * in good faith.' The District Court has jurisdiction to grant an injunction. It should proceed to determine whether it should exercise this jurisdiction."

A number of other cases which follow and are cited in support of the right to a fair and impartial hearing or trial also indicate the abandonment of the old theory of non-interference in expulsion cases.

The court's verbal decision rendered at the close of the case was based upon the ground that Mary Randolph was not given a fair and impartial trial or hearing in accordance with the terms of either the old or new Constitution. The old and the new Constitutions both provided methods for expelling members. The causes for which members could be expelled in either the old or the new need not be discussed inasmuch as the decision reached was upon the irregularity of the proceedings and not whether Mary Randolph's conduct was sufficient to warrant expulsion. The old Constitution provided for a fair and impartial investigation and trial, and the new one provides for a fair and impartial investigation and hearing in expulsion cases. As used in Article X of the old and the new Constitution there is little, if any difference, in the use of the word "trial" or "hearing." Both of these words, in their ordinary acceptation, in a democracy, comprehend an orderly procedure whereby the accused party is entitled to notice of such trial sufficiently in advance so that he may prepare his defense and summon witnesses. And, in a trial or hearing the accused also is entitled to be named specifically as one of the accused and to be apprized of the charges to be made against him at the trial in order to prepare a defense

Mary Randolph was given no notice naming her specifically as one of the accused. nor was she notified in advance of the trial of the accusations made against her. She was present at the July 17th meeting when the announcement was made

by the Reverend Rawlings to the effect that belligerent people would be dealt with, and that the church would withdraw the hand of fellowship from certain belligerent people who had violently opposed the advancement of the program of the church, and who were approached by the deacons with a view to reconciliation with the majority body of the church. The announcement did not by name mention who these people were.

The following are some of the many authorities which support the court's decision:

Jones v. State, 28 Nebraska 495, and which was cited by defendant in support of the demurrer to plaintiff's petition. Syllabus 2 of this case reads:

"A church organization may make rules by which the admission and expulsion of its members are to be regulated and the members must conform to these rules. If, however, it has no rules on the subject, those of the common law prevail, and before a member can be expelled notice must be given him to answer the charge made against him and an opportunity offered to make his defense, and an order of expulsion without such notice and opportunity is void."

And, on page 499, the court says:

"The right of membership is a valuable privilege of which no one should be debarred, except for adequate cause, shown either by the rules of the society or after a fair examination of the charges, after due notice. As neither of those things appear to have taken place, the order of expulsion would seem to be void."

Gray v. Christian Society, 137 Mass., 329, supra, syl. 1:

"A by-law of a religious society provided as follows: 'Any member who shall either cease to regularly worship with the society, or who shall fail to contribute to the support of its public worship for the term of one year, shall have his or her name dropped from the list of members.' HELD, that a member could be deprived of his membership only by a vote of the society, after a hearing."

And at page 331, Justice Oliver Wendel Holmes writing the opinion stated:

"They are judicial questions to be determined by the society, after giving the member notice and an opportunity to be heard. The necessity of complying with these requirements of common justice has been so uniformly asserted, that only a few cases need be cited, in addition to those last referred to, to show how unwilling courts have been to admit that charters, by-laws, or rules could be intended to deprive a man of his membership without a hearing."

Munsel v. Boyd, 10 O. C. C. (N. S.) 121, supra, syl. 4:

"The fact that members of a church have become dissatisfied with the pastor, and disapprove of the control into which the church has fallen and cease to attend its services does not afford ground, without some rule or law of the church therefor, for their dismissal or expulsion without notice or an opportunity to appear and defend; and a vote of expulsion under such circumstances does not terminate membership."

The court at page 125 states:

"Many of the expulsions to which I have referred, or attempted expulsions of members of the church, were had without any previous notice to the persons so sought to be expelled, so as to enable them to resist or defend against the attempted expulsion if they saw fit. * * * We think this could not be done * * *."

Monstakis v. Hellenic Orthodox Society, etc., 159 N. E. 453, at pp. 455-6, the court said:

"The report shows that both these classes of individuals were all members in good standing in the corporation, that they were expelled from such membership by vote of the standing committee, without notice, without opportunity to be heard, and without any valid reason, and that it would be vain for them to seek redress from the corporation itself. No rule or by-law of the corporation justified any such summary action. In the absence of express authority for arbitrary expulsion from membership, reasonable notice of charges made and fair opportunity to be heard are commonly required."

Krecker v. Shirey, 30 Atl. 440, the Supreme Court, at page 443 stated:

"Upon questions arising under the discipline, as upon those arising under the articles of faith, the decisions of the ecclesiastical courts are ordinarily final and they will be respected and enforced by the courts of law. * * * But if such decisions plainly violate the law they profess to administer, or are in conflict with the laws of the land, they will not be followed."

Kerr's Appeal, 89 Pa., 97, syl. 3:

"The decree of a church judicatory is binding only where it is affirmatively shown that it has acted within the scope of its authority, and has observed its own organic forms and rules."

David v. Carter, 222 S. W. (2d) 900, the Court of Civil Appeals (Texas) in syl. 4:

"The courts will not disturb any action by church in accordance with rules governing it, but will grant church members relief from disciplinary action shown to be a radical departure from church's accepted customs and rules."

Longmeyer et al v. Payne, et al, 205 S. W. (2d) 263, syl. 8:

"Where pastor at conclusion of service announced that he would 'set' the congregation for business meeting and those present at the purported meeting without any prior notice to anyone involved and without a hearing voted to. exclude opposing faction from membership, such action not being in accord with accepted ecclesiastical procedure of the church did not deprive opposing faction of membership."

The court therefore concludes:

1. That it had jurisdiction to hear and determine the issues in this case.

2. Whether under the old or the new Constitution, Mary Randolph was not given a fair and impartial investigation and trial or hearing and the action of the membership, on the night of August 7, 1952, attempting to expel Mary Randolph as a member of the defendant church is therefore, void and of no effect.

The interrogatories included in defendant's motion for separate finding of facts and conclusions of law raise questions of law which were not raised when defendant's demurrer to the petition was argued nor during the trial of this case. To avoid repetition and to explain the reasoning underlying the answers to some of the interrogatories certain facts and the law applying to these facts will be discussed before answering each of them.

Interrogatories Nos. 1 and 2 ask respectively if the old or new Constitution was in effect at the time of expulsion. These are followed by a series of questions which ask for further findings in the event the court finds that the old Constitution was in effect or relate to the old (Interrogatories 3, 5, 6, 7. 14) and others which ask for further findings in the event the court finds that the new Constitution was in effect or relate to the new Constitution (Interrogatories 4, 8, 15).

There was no provision in the old nor the new Constitution postponing the effective date of the new Constitution. The action taken at the meeting of August 7, 1952 (Exhibit 3) adopted the new Constitution to replace the old one. The old Constitution was repealed and replaced by the new immediately after the vote was taken on the motion to adopt the new  It was immediately after this action that the recommendation of the deacons to expel Mary Randolph and others was presented to and acted upon by the membership.

No provision was made in the old or new Constitution saving existing or pending actions or prosecutions, such as is found in §§26 and 26-1 GC, now §§1.20 and 1.21 R. C. whenever a

state statute is amended or repealed. These saving sections of the Ohio Statutes apply exclusively to statutory enactments of the legislature.

**In re: Ex Parte Clifton Brown, 6 O. O. 44:**

"Sec. 26 GC (§1.20 R. C.), providing that repeal or amendment of a statute shall not affect pending actions, prosecutions or proceedings unless otherwise provided in the amending or repealing act, does not apply to a municipal ordinance "

Earnhart v. The Village of Lebanon, 5 C. C. 578:

"HELD: That the bill of exceptions thus taken properly raises this question, and the ordinance on which the prosecution was based having been repealed without any saving clause, this operated to put an end to the pending prosecution, and the court erred therefore in rendering a judgment on such verdict."

The preliminary steps of investigation and the prosecution of Mary Randolph under the old Constitution, Section X, ended with the adoption of the new Constitution. The old Constitution was not in effect at the time of the expulsion of Mary Randolph.

The direct answer to Interrogatory No. 2 is that the new Constitution was in effect, as the church Constitution, at the time of the attempted expulsion of Mary Randolph as shown by the above discussion of Interrogatory No. 1. Interrogatory No. 2, as framed, is indefinite when appplied to the facts and law and does not call for a finding of ultimate facts nor probative facts from which ultimate facts can be inferred.

The question for determination is not whether the new Constitution was in effect at the time of the attempted expulsion of Mary Randolph but what effect this new Constitution had on the rights of Mary Randolph as a member of the church. In other words, could the church membership try or prosecute Mary Randolph under the provisions of the new Constitution which came into effect only minutes before her attempted expulsion, as shown by the August 7th minutes (Exhibit 3), and the testimony of the witnesses. That the acts which the deacons alleged she was guilty of occurred before the adoption of the new Constitution is shown by their recommendation, dated August 7, 1952, to withdraw fellowship (Exhibit 4), and the sequence of events at that meeting which was not attended by Mary Randolph.

To so attempt to invoke the provisions of Section X of the new Constitution to acts or conduct transpiring before the new Constitution was adopted was contrary to and in violation of the spirit and intent of the Constitution of the United

States, Article I, Sections 9 and 10, and the **Constitution of Ohio, Article II Section 28** relating to ex post facto and retroactive and retrospective laws.

These constitutional limitations apply to by-laws and regulations of private corporations and societies and proceedings under such by-laws and regulations.

In Albers v. Merchants' Exchange of St. Louis, 140 Mo. App. Rep. 446, the court held that by-laws providing expulsion of members are penal in character. Syllabus 1 of this case reads:

"In a proceeding to expel a member of a merchants' exchange, if the authority therefor is sought to be sustained by implication arising from the by-laws, it should be denied .on the ground the proceeding is penal in character, and hence the by-laws should be strictly construed and should not be extended by implication, so as to effectuate a forfeiture."

In a Michigan Supreme Court case, The People ex rel John Pulford v. The Fire Department of the City of Detroit, 31 Michigan 458, syl, 8 reads:

"By-laws or regulations are properly only rules for future action; and ex post facto laws are no more lawful for corporations than for states; and all by-laws contrary to the general principles of the common law or the policy of the state are void."

Complying with defendant's request the court therefore submits the following answers to the interrogatories:

### Interrogatory One.

Does the court find that the old constitution, which was in force prior to August 7, 1952, was the constitution in effect at the time of the expulsion of Mary Randolph by the church membership on August 7, 1952? No.

### Interrogatory Two.

Does the court find that the new constitution, adopted the night of August 7, 1952, was the constitution in effect at the time of the expulsion of Mary Randolph by the church membership on August 7, 1952?

The new Constitution, as the Constitution of defendant church, was in effect at the time of the attempted expulsion of Mary Randolph by the church membership on August 7, 1952; however, as just indicated in the introductory discussion of the law applying to interrogatory nos. 1 and 2 the provisions of Article X of the new Constitution could not be invoked or be effective in the attempted expulsion of Mary Randolph.

### Interrogatory Three.

In the event the old constitution was in effect, does the court find that the old constitution included the modes and manner of expulsion?

The old Constitution was in effect as the Constitution of defendant church from February 2, 1951, until the new Constitution was adopted at the meeting of August 7, 1952 and it included modes and manner of expulsion which became ineffective, however, with the adoption of the new Constitution.

### Interrogatory Four.

In the event the new constitution was effective, does the court find that the new constitution included the modes and manner of expulsion?

The new Constitution was effective as the Constitution of the defendant church from the time of its adoption at the meeting of August 7, 1952 and it included modes and manner of expulsion for infractions by members occurring after its adoption as heretofore indicated in the introductory discussion.

### Interrogatory Five.

Does the court find that it has jurisdiction to determine what constitutes "sufficient evidence of gross sin and failure to repent thereof," as set forth in the old constitution as the ground for expulsion in The Baptist Church of Lockland?

The right to expel Mary Randolph for infractions in violation of the provisions of the old Constitution were lost when the new Constitution was adopted. Consequently, this court's interpretation of the terms of the old Constitution are not in issue in the case. The court does not have jurisdiction to make such determination.

### Interrogatory Six.

Does the court find that it has the power and jurisdiction to interpret the scripture of Matthew, 18th Chapter, 15th to 17th Verses, as set forth in Article X of the old constitution of the Lockland Baptist Church?

No, for the same reason set forth in Interrogatory Five.

### Interrogatory Seven.

In the event you find the old constitution governs, does the court find that the Lockland Baptist Church gave Mary Randolph a fair and impartial investigation and trial according to Matthew, 18th Chapter, 15th to 17th Verses?

As already indicated the old Constitution did not govern the attempted expulsion of the plaintiff.

Courts are required to answer all interrogatories eliciting ultimate facts or probative facts from which ultimate facts can be inferred as a matter of law. Any answer to this question would not come within these categories. Even though a court had found that the old Constitution governs certain procedures with reference to the attempted expulsion of Mary Randolph, the question would not be whether Mary Randolph was given

a fair and impartial investigation and trial according to Matthew. The question would be whether Mary Randolph was given a fair and impartial investigation and trial under all the provisions of Article X of which Matthew Chapter 18, 15th to 17th Verses was only a part.

### Interrogatory Eight.

Does the court find that it has jurisdiction to determine what constitutes "conduct unbecoming a Christian" as set forth in the new constitution, as a ground for expulsion in the Lockland Baptist Church?

Because the provisions of the new Constitution are properly only rules for future conduct and action, and ex post facto and retroactive prosecutions are prohibited by law Mary Randolph could not be prosecuted under these provisions for alleged offenses occuring prior to its adoption.

The question, in any event, would not be whether the court has jurisdiction to determine, generally, what constitutes "conduct unbecoming a Christian" as set forth in the new Constitution as a ground for expulsion. The question would be whether specific acts or conduct of Mary Randolph were such as to constitute "conduct unbecoming a Christian." Because of the general nature of the question the answer is no.

### Interrogatory Nine.

Does the court find that Mary Randolph, as a member of the Lockland Baptist Church for seventeen years, submitted to and knew of the manner of giving notice in matters of expulsion of said church?

The answer to this interrogatory would determine no ultimate facts nor probative facts from which ultimate facts could be determined. The court, therefore, declines to answer this interrogatory.

### Interrogatory Ten.

Does the court find that Reverend John Rawlings made an announcement from the pulpit on July 17, 1952 in which he stated in essence: "The belligerent members that were visited by the deacons will be dealt with in a meting on August 7, 1952," at which said July 17, 1952 meeting Mary Randolph admitted being present?

The court finds that the Reverend John Rawlings made an announcement from the pulpit on July 17, 1952 in essence, but not as a direct quote, as set forth in the interrogatory. Mary Randloph did admit being present at the meeting of July 17th and the court so finds.

### Interrogatory Eleven.

Does the court find that plaintiff, Mary Randolph, attended

every monthly business meeting of the church in 1952 up to the month of August except the business meeting at which the hand of fellowship was withdrawn from her on August 7, 1952?

No. The court, however, finds that Mary Randolph attended practically every monthly business meeting of the church in 1952, up to the month of August, and that she did not attend the business meeting of August 7, 1952.

### Interrogatory Twelve.

Does the court find that Dr. John Rawlings is a Doctor of Theology, an officer of various Baptist ministerial associations, and a practicing Baptist minister for thirteen years?

Yes.

### Interrogatory Thirteen.

If the answer to question 12 is "Yes" or "No," does the court find that Dr. John Rawlings is one qualified as an expert to interpret holy scripture from the standpoint of the Baptist religion and belief?

The court finds that the Reverend John Rawlings qualified sufficiently to admit his testimony as an expert witness to interpret Holy Scriptures from the standpoint of the Baptist religion and belief on matters relevant and pertinent to the issues in this case.

### Interrogatory Fourteen.

In the event the court finds the old constitution is in effect, and in the event the court finds the old constitution does not prescribe the mode and manner of expulsion, on what basis did the court find that plaintiff, Mary Randolph, was expelled from the membership of the Lockland Baptist Church?

### Interrogatory Fifteen.

In the event the court finds the new constitution is in effect, and in the event the court finds the new constitution does not prescribe the mode and manner of expulsion, on what basis did the court find that plaintiff, Mary Randolph, was expelled from the membership of the Lockland Baptist Church?

The premise on which both of these questions, 14 and 15, are propounded is erroneous. The court did not find that Mary Randolph was expelled. To the contrary the court found that plaintiff was not given a fair and impartial investigation and trial and that the procedures adopted by the membership to expel Mary Randolph were irregular and, therefore, were null and void.

### Interrogatory Sixteen.

Does the court find that expulsion from the membership of the Lockland Baptist Church deprives the plaintiff, Mary Randolph, of an ecclesiastical right of freedom of worship?

### Interrogatory Seventeen.

Does the court find that expulsion from the membership in the Lockland Baptist Church deprives the plaintiff, Mary Randolph of a civil right of freedom of worship?

These interrogatories, 16 and 17, do not elicit ultimate facts nor probative facts upon which ultimate facts could be found. The court, therefore, declines to answer them.

As stated preliminary to the answers to the interrogatories, the questions of law raised by them had not been previously raised, but the facts involved and the law applicable to them afford additional and distinct support to the court's original decision, that the attempted expulsion was null and void and of no effect.