[Cite as *Smith v. White*, 2014-Ohio-130.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

JACK L. SMITH, et al.

      Plaintiffs-Appellants

v.

CHAD A. WHITE, SR., et al.

      Defendants-Appellees


Appellate Case No.    25622

Trial Court Case No.   2011-CV-00821

(Civil Appeal from
 Common Pleas Court)

. . . . . . . . . . .

# O P I N I O N

Rendered on the 17th day of January, 2014.

. . . . . . . . . . .


GRETCHEN M. TREHERNE, Atty. Reg. No. 0047376, KIRSTIE N. YOUNG, Atty. Reg. No. 0084007, 400 PNC Center, 6 North Main Street, Dayton, Ohio 45402
      Attorneys for Plaintiffs-Appellants

GORDON D. ARNOLD, Atty. Reg. No. 0012195, PATRICK J. JANIS, Atty. Reg. No. 0012194, 1 South Main Street, Suite 1800, Dayton, Ohio 45402
      Attorneys for Defendants-Appellees

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1}    Plaintiffs-Appellants, Jack Smith, et. al., appeal from a judgment of dismissal rendered in favor of Defendants-Appellees, Chad White, et. al.[1]  Smith contends that the trial court erred in dismissing the case for lack of subject matter jurisdiction, because the dispute between the parties is secular.  Smith further contends that dismissal for lack of subject matter jurisdiction is improper because the case contains allegations of fraud and collusion.  Finally, Smith contends that the dismissal was improper because church members attempted to use internal church procedures to resolve the dispute.

{¶ 2}    We conclude that the trial court did not err in dismissing the case for lack of subject matter jurisdiction.  The inquiry involved in this case goes to the issue of whether the pastor engaged in wrongdoing, rendering him unqualified as a pastor, and whether the pastor should be removed for misconduct.  Courts may not inquire into these matters under the ecclesiastical abstention doctrine.

{¶ 3}    A fraud or collusion exception allowing consideration of ecclesiastical matters is also inapplicable because this case does not involve extraordinary circumstances.  Finally, Smith never followed the procedures listed in the governing church documents for resolving the matters at hand.  This must have been done before initiation of any potential court action.  Accordingly, the judgment of the trial court will be affirmed.

---

[1]    Plaintiffs are a group of 36 members of Mt. Carmel Missionary Baptist Church, and the defendants include the pastor of the church, nine members of the church, and the church, itself.    For purposes of convenience, we will refer to plaintiffs, collectively, as Smith (the first-named plaintiff), and to defendants, collectively, as White (the first-named defendant).

I.  Facts and Course of Proceedings

{¶ 4}    As was noted, the 36 plaintiffs are members of Mt. Carmel Missionary Baptist Church (Mt. Carmel).  Five plaintiffs are trustees at the church, and three are church deacons. Mt. Carmel was chartered in 1967 and is a congregational church.  The most recent constitution was effective in 2002.  Plaintiff-Appellant, Jack Smith, is one of the committee members listed on the 2002 constitution.

{¶ 5}    Article VI, Section I of the Mt. Carmel constitution pertains to church government and provides that the church will have certain "corporate officers," including the pastor as president.  Other officers include a treasurer, a church clerk, and a financial secretary. Motion of Defendants to Dismiss Plaintiff's Complaint, Doc. #49, Ex. G, pp. 5-6.  In addition, the constitution provides that the officers of the church shall be the pastor, deacons, and trustees. *Id*. at p. 6.  The deacons are "responsible for administering to the temporal, physical and benevolent concerns of the church."  *Id*. at p. 8.  The board of trustees, in contrast, is charged with representing the church in legal and corporate matters, and with exercising supervision "over all matters relating to the operation and maintenance of the church and its properties."  *Id.*

{¶ 6}    Article VII, Section 1 of the constitution provides that an annual church conference will be held each year in November, to discuss and vote on the church calendar, election of officers, budget and financial reports, ministry reports, and member suggestions or recommendations.  Semi-annual meetings must also be held yearly each June, for purposes of discussing and voting on church business, delinquent members, and projects.  *Id.* at p. 12.

{¶ 7}    In addition, special meetings may be called at the request of no less than 25

members or by the pastor and deacons. Concurrent with the request for a special meeting, the items to be considered are to be set forth concurrently by those calling the meeting. Notice of the meeting and the items to be considered are also to be given to the congregation. *Id.* The constitution further requires that a quorum of two-thirds of the eligible voting members must be present to vote on matters, and that majority-rule applies to carry a vote. *Id.* at Article VII, Section 3(B), p. 13.

{¶ 8} Mt. Carmel's constitution provides the following method for involuntarily terminating a pastor:

A. When there is continual dissension or confusion originated by the Pastor, the Chairman of Deacons shall have a conference with the Pastor and state the conditions under which he came to serve this church. (Articles II-V). Any of the following, but not limited to, may be a reason to question his call, ability or integrity to serve for Mount Carmel Missionary Baptist Church:

1. Breach of faith.

2. Defy the Covenant.

3. Immoral conduct.

4. Violate the Constitution, Bylaws or any other policy endorsed by our congregation.

B. The charge can be made to the Chairman of Deacons or by any member in good standing (Article 4, Section 6). All reasonable attempts within a ninety-day period (90) shall be made to resolve the grievance.

C. If the grievance is not resolved, the Chairman of Deacon[s] or a

member (Article 7, Section 1D.) may initiate the call for a meeting of the congregation to consider termination of the Pastor.

D.   If the recommendation for termination is approved as stated under the rules of bare majority shall be required to dismiss a Pastor.   (Article 6, Section D).   Motion of Defendants to Dismiss Plaintiff's Complaint, Doc. #49, Ex. G, pp. 13-14.

**{¶ 9}**     Finally, the constitution provides a procedure for member grievances, which begins by the member's submission of a statement of the grievance to the chairman of the deacons.   The chairman then discusses the matter with the pastor to decide if an ad hoc committee shall be formed to review the allegations.   If a member is dissatisfied with the decision of the ad hoc committee, he or she may request a hearing where the member may be accompanied by others who are supportive.   Both supporters and opposition are to be allowed to speak.   The pastor then issues a final and binding decision within 30 days.   *Id.* at Article V, Section 6(C), p. 5.

**{¶ 10}**   With respect to the background of the church, we note that Pastor Chestain came to Mt. Carmel in 1975 and retired a few years prior to 2003, when Defendant-Appellee, Chad White, was hired as the new pastor.   Because Chestain did not have a retirement plan, the congregation established a $120,000 annuity for Chestain that would pay retirement benefits.   At such time as Chestain died, half the remaining annuity was to be paid to his wife, and the rest was to be returned to Mt. Carmel.   In order to avoid a similar problem in the future, Mt. Carmel established another pastor's retirement annuity after White was hired. The annuity was not in White's name, but was in the name of Mt. Carmel.

**{¶ 11}** After White was hired, members of the congregation learned that things on his resume were not truthful. For example, White said he had finished divinity school, but he had not. The church gave White money to finish school, but White never showed the church any record indicating that he had finished. After the property used to house pastors (the manse) was sold in 2007, members questioned where the proceeds had gone. The testimony indicated that this money had apparently been "hidden" by the chairman of the finance committee because the pastor was spending so much money.

**{¶ 12}** Although not specifically codified in the bylaws or constitution, the policy at Mt. Carmel for many years was that any expenditure over $4,000 had to be approved by the congregation. Furthermore, initial decisions on financial and other matters were made by the deacons and trustees. By 2009, White had essentially bypassed the normal decision-making process in the church, and financial decisions were being made by a small group of people. Around this time, approximately $10,000 was raised for a Haitian relief fund. White allegedly personally delivered the money to Haiti, but no receipts were ever provided for the transaction. In addition, $5,279 was spent on the installation of windows at White's personal residence without prior authorization from the congregation.

**{¶ 13}** In 2010, White asked the deacons and trustees to co-sign for a new car. The car apparently needed about $3,000 in repairs, and White said he would rather trade it in than have it fixed. White did not tell the trustees and deacons that the car was being repossessed. The deacons and trustees objected to the request, and the matter was supposed to be presented to the congregation the following day. However, two defendants, Cora Franklin and Willie Fowler, removed approximately $45,000 from the retirement annuity account. Franklin and Fowler were

aligned with White and were two of only four people who were allowed to sign checks on behalf of the church. Franklin had personally advanced White money for the repairs and to bring his car payments current. After Fowler obtained the retirement check, it was cashed and Franklin was reimbursed. The rest of the money was then given to White. The deacons and trustees were not informed about what had happened until later.

{¶ 14} In June 2010, the church was supposed to have a congregational meeting, but the meeting was cancelled. At least 25 members of the church then called for a special meeting to discuss various matters, including the decisions on spending money, the windows, and a church credit card that White had allegedly "maxed out." The letter requesting a special meeting outlined in detail the matters that the members wished to discuss. The dissenting members wanted a meeting with James Refour, the chairman of the deacons, instead of White, but Refour refused. After receiving the request for a special meeting from Smith's lawyer, Refour and another deacon sent Smith a letter on behalf of the church, instituting disciplinary proceedings against him for seeking legal advice.

{¶ 15} A special meeting was held in October 2010, and was moderated by another pastor, Reverend Byrd. However (according to the plaintiffs), people were prevented from asking questions at that meeting, and nothing was accomplished.

{¶ 16} In December 2010, the church's controller of finance resigned without providing financial data, and removed the hard drive from the church computer. Subsequently, in February 2011, Smith filed the present lawsuit, alleging breach of fiduciary duty against White, and the following claims against all defendants: conversion; civil conspiracy; unjust enrichment; fraud; and breach of contract. Smith also asked for an accounting for all church

funds over the past seven years, as well as other relief.

{¶ 17}   At some point, a special committee was formed to assist with accounting for the first six months of 2010.   An outside accountant was also retained in January 2011 to assist with the 2011 financial reports.   Ultimately, financial reports for 2010 were presented at a November 29, 2011 congregational meeting.

{¶ 18}   Although Fowler had told others that the pastor's retirement account had been emptied, the reports that were finally provided at the November 2011 congregational meeting stated that the retirement account contained almost $28,000 at the end of 2010.   According to the reports, the account contained about $70,000 at the beginning of 2010, and $42,841.29 was withdrawn, leaving a balance of about $28,000.   However, this was inconsistent with the check stub that had been seen by one of the plaintiffs.   It was also inconsistent with Fowler's statement that the account had been emptied.   Accordingly, Plaintiff, John Marsh, a member of the finance committee and church treasurer, concluded that money had to have been transferred from other church accounts.   When Marsh attempted to make a statement about the retirement account at the congregational meeting, he was prevented from speaking, due to a rule that board members would not elaborate on matters that had been discussed during board meetings.   After the microphone was taken away from Marsh and he was not permitted to talk, he and several others left the meeting.

{¶ 19}   The 2010 treasurer's report, which included the withdrawal from the retirement fund, was accepted at the November 2011 meeting.   The depositions that were submitted to the trial court indicated some confusion over whether a quorum existed at the time of the vote, or whether the vote actually carried, but no one asked for another count.

**{¶ 20}** In March 2011, White filed a motion to dismiss the complaint under Civ.R. 12(B) for lack of jurisdiction and lack of standing. Subsequently, in October 2011, the trial court overruled the motion and granted Smith's motion to amend the complaint. After filing an answer, White filed a motion to dismiss the complaint pursuant to Civ.R. 12(B)(1). In support of the motion, White filed the affidavit of James Refour, and also relied on depositions of various plaintiffs. After considering the matters raised by the parties, the trial court granted the motion to dismiss in February 2013. In particular, the trial court concluded that it was prohibited from inquiring into areas of church government, and that Smith had failed to exhaust internal procedures. Smith appeals from the judgment dismissing the action.

## II. Did the Trial Court Err in Concluding
## that the Dispute Is Non-Secular?

**{¶ 21}** Smith's First Assignment of Error states that:

The Trial Court Erred in Dismissing the Case for Lack of Subject Matter Jurisdiction, Where the Dispute was Secular.

**{¶ 22}** Under this assignment of error, Smith contends that this case should not have been dismissed because it does not involve ecclesiastical matters, does not ask the court to decide "who will preach from the pulpit," and does not seek the removal of the pastor. In response, White contends that regardless of the way in which the complaint is phrased, the church members who participated in the lawsuit are asking the court to make decisions on White's conduct and whether he met the standards of the congregation – both of which are ecclesiastical decisions.

{¶ 23} White's motion was brought pursuant to Civ.R. 12(B)(1), which permits defendants to file motions to dismiss based on lack of subject matter jurisdiction. "In determining whether a plaintiff has alleged a cause of action sufficient to withstand a Civ.R. 12(B)(1) motion to dismiss for lack of subject matter jurisdiction, a trial court is not confined to the allegations of the complaint, and it may consider evidentiary material pertinent to such inquiry without converting the motion to a motion for summary judgment." (Citations omitted.) *Tibbs v. Kendrick*, 93 Ohio App.3d 35, 39-40, 637 N.E.2d 397, 400 (8th Dist.1994).

{¶ 24} "In considering the motion to dismiss for lack of subject-matter jurisdiction, the court may hold an evidentiary hearing and resolve any disputed facts related to the court's inquiry. The court may dismiss a complaint for lack of subject-matter jurisdiction based upon '(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts, plus [its] resolution of disputed facts.' " (Footnotes and citations omitted.) *Horine v. Vineyard Community Church*, 1st Dist. Hamilton No. C-060097, 2006-Ohio-6620, ¶ 5, quoting *Jenkins v. Eberhart*, 71 Ohio App.3d 351, 355, 594 N.E.2d 29 (4th Dist.1991). (Other citation omitted.)

{¶ 25} In *Horine*, the First District Court of Appeals also noted that:

"If the trial court's disposition of the [Civ.R.12(B)(1)] motion was based on 'the complaint supplemented by undisputed facts evidenced in the record,' appellate review is limited to a determination of whether the facts are indeed undisputed and whether the trial court correctly applied the law. If the disposition of the motion was also based on the trial court's resolution of disputed factual issues, our standard of review is that applicable to any other determination

founded upon a trial court's resolution of disputed factual issues, i.e., whether the trial court had before it competent and credible evidence to support its determination." *Horine* at ¶ 6, quoting *Wilkerson v. Howell Contrs., Inc.*, 163 Ohio App.3d 38, 2005-Ohio-4418, 836 N.E.2d 29, ¶ 10 (1st Dist.). (Other citation omitted.)

{¶ 26} In the case before us, the trial court appears to have confined itself primarily to the allegations in the complaint and Mt. Carmel's constitution and bylaws. After setting forth the allegations in the complaint and the elements of the various causes of action, the trial court concluded that the disputes required the court to "ultimately answer questions as to 'who should preach from the pulpit' and as to whether the committee members' performance of their duties met the standards of the congregation, which the court is precluded from doing under the First and Fourteenth Amendments." Decision, Order, and Entry Sustaining Defendant's Motion to Dismiss, Doc. #115, p. 22. The trial court does not appear to have resolved factual issues or to even have addressed them; instead, the court appears to have concluded that it could not intervene even if the allegations of misconduct were true. Accordingly, our review is confined to whether the trial court correctly applied the law.

{¶ 27} "It is well established that civil courts lack jurisdiction to hear or determine purely ecclesiastical or spiritual disputes of a church or religious organization." (Citations omitted.) *Tibbs*, 93 Ohio App.3d at 41, 637 N.E.2d 397. In *Tibbs*, the court also noted that "[g]enerally, the question of who will preach from the pulpit of a church is an ecclesiastical question, review of which by the civil courts is limited by the First and Fourteenth Amendments to the United States Constitution." *Id.*, citing *Kedroff v. St. Nicholas Cathedral of Russian*

*Orthodox Church in N.A.*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952).

{¶ 28}    The Supreme Court of Ohio has noted that "[t]wo broad types of church polity are generally recognized by the courts: (1) hierarchical and (2) congregational." *State ex rel. Morrow v. Hill*, 51 Ohio St.2d 74, 76, 364 N.E.2d 1156 (1977) (Footnote and citation omitted.)

{¶ 29}    No one has disputed that Mt. Carmel has a congregational form of government, which "exists when 'a religious * * * congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority.' " *Id.*, quoting *Watson v. Jones*, 13 Wall 679, 722, 723, 20 L.Ed. 666 (1871). " 'In the congregational form, each local congregation is self-governing.' " (Citation omitted.) *Southern Ohio State Exec. Offices of Church of God v. Fairborn Church of God*, 61 Ohio App.3d 526, 535, 573 N.E.2d 172 (2d Dist.1989).

{¶ 30}    However, regardless of whether a church organization is self-governing or is hierarchical, courts have limited ability to intervene. In discussing its prior authority on the power to intervene in religious matters, the Supreme Court of the United States stressed that:

"The opinion (in *Watson v. Jones*) radiates * * * a spirit of freedom for religious organizations, an independence from secular control or manipulation – in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. Freedom to select the clergy, where no improper methods of choice are proven, we think, must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference." *Presbyterian Church in U.S. v. Mary Elizabeth Blue*

*Hull Memorial Presbyterian Church*, 393 U.S. 440, 448, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), quoting *Kedroff*, 344 U.S. at 116, 73 S.Ct. 143, 97 L.Ed. 120.

**{¶ 31}** In *Presbyterian Church*, the Supreme Court went on to note that:

Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes, * * *; the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. *Presbyterian Church* at 449-450.

**{¶ 32}** At the time, the Supreme Court did not outline the parameters of these "neutral

laws." Subsequently, however, courts have permitted causes of action to be maintained on issues such as age discrimination and breach of contract. For example, in *Potts v. Catholic Diocese of Youngstown,* 159 Ohio App.3d 315, 2004-Ohio-6816, 823 N.E.2d 917 (7th Dist.), the Seventh District Court of Appeals concluded that the plaintiff had stated a viable cause of action against her employer, a Catholic Diocese, "for breach of contract for the value of compensation and benefits already accrued, and * * * should be permitted to litigate her claim." *Id.* at ¶ 28.

{¶ 33} Furthermore, although the Seventh District Court of Appeals ultimately concluded that the plaintiff had failed to provide evidence of pretext, the court also noted that the First Amendment does not preclude a limited inquiry into the allegation that " 'the doctrinal reason proffered * * * for the * * * termination was a mere pretext and that [the] firing was actually motivated by age discrimination.' " *Id.* at ¶ 23, quoting *Basinger v. Pilarczyk*, 125 Ohio App.3d 74, 76, 707 N.E.2d 1149 (1st Dist.1997). *See, also*, *Manno v. St. Felicitas Elementary School*, 161 Ohio App.3d 715, 2005-Ohio-3132, 831 N.E.2d 1071, ¶ 16 (8th Dist.) (holding that various claims of teacher fired from parochial school after failing to obtain annulment before remarriage did not require analysis or interpretation of church doctrine. The claims in the case included age discrimination, negligence, intentional infliction of emotional distress, breach of contract, implied breach of contract, and negligent misrepresentation.)[2]

---

[2] The ability to bring discrimination suits may be affected by a recent decision of the United States Supreme Court, which held that a ministerial exception applies to bar employment discrimination suits by ministers against religious societies. The Court held that this is an affirmative defense, not a jurisdictional bar. *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, ____ U.S. ____, 132 S.Ct. 694, 709, fn. 4, 181 L.Ed.2d 650 (2012). Among the factors the Court considered in concluding that the plaintiff was a "minister" were the formal title given to her by her church, "the substance reflected in that title," the plaintiff's own use of the title, and "the important religious functions she performed for the Church * * *." *Id.* at 708. The Court also stated that "Today we hold only that the ministerial exception bars such a suit. We express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers. There will be time enough to address the applicability of the exception

**{¶ 34}** Similarly, in *Zhelezny v. Olesh*, 10th Dist. Franklin No. 12AP–681, 2013-Ohio- 4337, the Tenth District Court of Appeals concluded that the trial court had jurisdiction over claims against a church and various church members for malicious prosecution, civil conspiracy, and intentional infliction of emotional distress. *Id.* at ¶ 35-42.

**{¶ 35}** The plaintiff in *Zhelezny* had been engaged in an ongoing dispute with his church, and his access to the church had been restricted. *Id.* at ¶ 2. Criminal trespass charges were filed and dismissed, and the plaintiff was also involved in a physical altercation with an assistant pastor in February 2011. *Id.* at ¶ 2, fn. 1, and ¶ 3. The plaintiff then filed suit against the church, church members, and various governmental defendants, alleging claims for assault and battery, extortion, malicious prosecution, violation of civil rights, civil conspiracy, and intentional infliction of emotional distress. *Id.* at ¶ 4. After the trial court dismissed the case, the plaintiff appealed. *Id*. at ¶ 6.

**{¶ 36}** Some claims were dismissed on the basis of the statute of limitations. However, with respect to the civil rights, intentional infliction of emotional distress, and civil conspiracy claims, the trial court decided that it lacked jurisdiction because these matters involved ecclesiastical questions that the court could not appropriately consider. *Id*. at ¶ 35. On appeal, the plaintiff argued that "all of his claims involve secular matters which are governed by neutral principles of common law." *Id*. at ¶ 37.

**{¶ 37}** The Tenth District Court of Appeals agreed with the church that the merits of

to other circumstances if and when they arise." *Id.* at 710.

the pastor's decision to ban the plaintiff were ecclesiastical and could not be reviewed. However, the court of appeals found that the trial court had jurisdiction over the rest of the common law claims.   In this regard, the court stated that:

> With respect to appellant's common law tort claims, the evidence in the record clearly establishes that this dispute is born out of appellant's estrangement from the church, his objections to the pastor, and his perception that church leadership mistreated him and his family.  However, it is also evident from the record that appellant's malicious prosecution claim arises from a single incident that occurred in April 18, 2010, and that his claim for civil conspiracy arises from the alleged agreement among several church leaders and members to falsely accuse him of criminal trespass and to physically assault him in February 2011. The crux of his claim for intentional infliction of emotional distress is that the conduct of appellees was extreme and outrageous, and that it caused him serious emotional harm.

> The ban letters establish that on December 17, 2008, Pastor Olesh severely restricted appellant's access to the church for a period of one year due to appellant's "unacceptable and offensive behavior," on December 14, 2008, and for "previous incidents."   In December 20, 2009, Pastor Olesh extended the restrictions for another year for the stated reason that appellant did not behave "in a Christian manner" on December 19, 2009.  The ecclesiastic abstention doctrine precludes the court from adjudicating the merit of the pastor's decision.   The record, however, does not contain any evidence that the ban was extended beyond

December 2010.

A property owner has a privilege to use force to eject a trespasser. *See, e.g., Hartwig v. Robinson*, 3d Dist. No. 15-97-03 (Oct. 9, 1997); 1 Restatement of the Law 2d, Torts, Section 77 (1965). However, given the absence of evidence to support a finding that Pastor Olesh extended the ban into 2011, the court is unable to sustain the trial court's determination. *See Leyland v. Blataric*, 9th Dist. No. CA-741 (Dec. 29, 1977) (the question whether the plaintiff was a trespasser and whether defendant used excessive force is generally questions [sic] for the jury).

Appellant's claims of malicious prosecution and civil conspiracy may also be decided independent of any ecclesiastical matters. The issue whether appellees had probable cause to prosecute appellant for trespassing depends on whether appellant was invited to the church on April 18, 2010, as he claims in the complaint. The merit of appellant's assertion can be determined without reference to the governing documents of the church and without a determination of the merits of the ban.

Furthermore, to the extent that the incidents of April 18, 2010, and February 2011 form the factual basis of appellant's claims for intentional infliction of emotional distress and civil conspiracy, the present record shows that those claims can be resolved without the need for an examination of purely ecclesiastical issues. For these reasons, we hold that the trial court erred when it determined that it was without jurisdiction of the common law claims of civil conspiracy and intentional infliction of emotional distress. *Zhelezny,* 10th Dist.

Franklin No. 12AP-681, 2013-Ohio- 4337, at ¶ 38-42.

**{¶ 38}** In contrast, the Tenth District Court of Appeals also concluded that the courts lacked jurisdiction over the plaintiff's civil rights claim. In this regard, the court noted that:

> [T]he inquiry is whether appellees['] alleged conspiracy with the sheriff and prosecutor to initiate and continue an unwarranted criminal prosecution against appellant was motivated by appellees' hostility to appellant's free exercise rights. Thus, the court must determine whether appellant has the right to worship at Grace and to associate with other Grace members at church functions. In so doing, the trier of fact must also determine whether appellees have the right to exclude appellant from the church and its functions. We do not believe that the trier of fact can make the necessary determination without re-examining the merits of appellees' decision to ban appellant from the church. Such an examination certainly requires an interpretation of the church's governing documents as they relate to church disciplinary issues. When viewed in this light, it becomes evident that a ruling upon the merits of appellant's civil rights claim will result in a prohibited judicial review of a church disciplinary decision. *Id.* at ¶ 48.

**{¶ 39}** In *Bhatti v. Singh*, 148 Ohio App.3d 386, 392-393, 2002-Ohio-3348, 773 N.E.2d 605 (12th Dist.), the Twelfth District Court of Appeals held that civil jurisdiction existed where the parties "were not disputing doctrine or religion, but only who controlled the property, namely, the accounts and the Gurudwara [Sikh temple]. As such, the dispute did not hinge on an ecclesiastical or spiritual dispute, but a non-doctrinal property dispute." *Id.* at ¶ 28.

**{¶ 40}** In a recent decision, the Eighth District Court of Appeals considered whether a

trial court had erred in rendering summary judgment in favor of members of a church who had been sued by the church for interference with the operation of the church and for an accounting. *Slavic Full Gospel Church, Inc. v. Vernyuk*, 8th Dist. Cuyahoga No. 97158, 2012-Ohio-3943, ¶ 2-3. The Eighth District Court of Appeals noted that "[t]he first two counts of the Church's amended complaint allege that defendants 'defected' from the Church and essentially ask the court to interpret the Church's charter and determine who is a proper member." *Id.* at ¶ 21. The court of appeals concluded that these two counts were "clearly ecclesiastical in nature" and that the trial court lacked jurisdiction over them. *Id.* at ¶ 23. However, the court also concluded that the third cause of action, which requested an accounting, was "secular in nature." *Id.* at ¶ 26. After discussing the facts, the Eighth District Court of Appeals concluded that summary judgment had been properly rendered, because the church failed to present sufficient evidence to show that genuine issues existed for trial. *Id.* at ¶ 24-30.

{¶ 41} We reached a contrary holding in *Robinson v. Freedom Faith Missionary Baptist Church,* 2d Dist. Montgomery No. 20232, 2004-Ohio-2607. In *Robinson*, the plaintiff brought a pro se action for an audit and accounting of the church's financial records, alleging that the church secretary and treasurer had not properly accounted for funds, and that funds were being diverted. *Id*. at ¶ 12. In addition, the plaintiff contended that the pastor had said he was going to appoint his mother, who worked for an accounting company, as the bookkeeper. *Id.* at ¶ 13. An additional allegation was that the church was operating without written rules or regulations. *Id*.

{¶ 42} Our opinion quotes extensively from the trial court's order, which adopted the magistrate's recommendation that the case be dismissed. *Id.* at ¶ 1 and ¶ 9-33. Among other

passages, we quoted the following part of the trial court's decision:

"In the present case, the Magistrate concluded that the religious organization involved is a congregational organization. The Plaintiff has offered no evidence to refute this finding and the evidence supports such a conclusion. Therefore, this Court must examine the second prong of the test to determine whether this is a secular or ecclesiastical issue. This Court has subject matter jurisdiction only if the dispute involves secular issues.

The dispute in this case involves allegations that the Defendants have breached their fiduciary duty to act in the best interest of the church. The Defendants include the pastor of the church, as well as the secretary and treasurer of the church. In *State ex rel. First New Shiloh Baptist Church v. Meagher* (April 16, 1997), 1st Dist. No. C-960371, which is cited in the Magistrate's decision, the court explained that 'the lower court has no jurisdiction over the claims brought by the individual members of the congregation seeking to oust the pastor or hold the Board liable for breach of fiduciary duty to the congregation.' In that case, the plaintiffs were members of a congregational church who brought claims against the pastor of the church for breach of fiduciary duty. The court of appeals explained that if the trial court had ordered an accounting of the church finances to determine whether the pastor had been engaged in wrongdoing, the heart of the inquiry would be whether or not the pastor should be removed, which is an ecclesiastical issue.

Similarly in the present case, the Plaintiff has made an allegation of breach

of fiduciary duty and seeks an accounting of church finances. This inquiry would necessarily involve whether the pastor of the Church engaged in wrongdoing, and therefore, whether he should be removed as pastor. This is not a matter for the Court to decide. In *Tibbs v. Kendrick*, the court explained that it is not the province of civil courts to determine who should be preaching from the pulpit. *Tibbs v. Kendrick* (1994), 93 Ohio App.3d 35, 41, 637 N.E.2d 397. If this Court were to exercise jurisdiction in this matter, this Court would be improperly interfering in the ecclesiastical matters of a church. Moreover, if the Court had any doubt that this case involves an ecclesiastical issue, the Plaintiff's Objections to the Magistrate's Decision, referring the court to passages from the Bible and explaining that the Church is governed by God, demonstrate that the matters involved in this case are beyond the jurisdiction of this Court.["] (quotation marks omitted.) *Robinson*, 2d Dist. Montgomery No. 20232, 2004-Ohio-2607, at ¶ 27-29.

**{¶ 43}** After reciting extensively from the trial court's decision, we concluded that the trial court's decision had correctly addressed all the issues raised on appeal, other than an issue involving arbitration (which is not relevant to the case presently before us). *Id.* at ¶ 34-35. We then affirmed the dismissal of the action. *Id.* at ¶ 39.

**{¶ 44}** Based on the conflict in decisions, we must either distinguish or follow our prior precedent in *Robinson*, or we must overrule *Robinson* and agree with *Slavic Full Gospel Church*.

**{¶ 45}** We see no basis upon which to distinguish *Robinson*, since it involves factual claims that are similar to those in the case before us. It is less clear that requiring an accounting

(a purely legal remedy) would " 'necessarily involve whether the pastor of the Church engaged in wrongdoing, and, therefore, whether he should be removed as pastor.' " *Robinson* at ¶ 29. This statement is somewhat broad, and the plaintiffs in the case before us have not asked that the pastor be removed.[3] A procedure for the pastor's removal is provided in the Mt. Carmel constitution, and if that is what plaintiffs seek, that is the process they should follow.

**{¶ 46}** We also note that the case relied on in *Robinson,* i.e., *State ex rel. First New Shiloh Baptist Church v. Meagher*, 1st Dist. No. C-960371, 1997 WL 180266 (April 16, 1997), involved a claim by members of a church, who said that they had tried to "require the board of directors of the church * * * to investigate the allegedly wrongful conduct of the pastor of the church, * * * and to terminate his employment. Allegedly, no action was taken against [the pastor], and the individual members claim that the Board thereby breached its fiduciary duty to the congregation." *Id*. at *1. The factual situation in *First New Shiloh* more clearly involves the issue of "who has the right to preach from the pulpit," and does not necessarily support a lack of jurisdiction over an accounting. In fact, the parties in *First New Shiloh* acknowledged that removal was the issue, and the trial court ordered that an election must be held to decide whether the pastor should be recalled. *Id*. at *3. This was clearly an improper interference in matters entrusted to the church.

**{¶ 47}** Nonetheless, after concluding that the trial court lacked jurisdiction to decide who should preach, the First District Court of Appeals noted in *First New Shiloh* that the trial court had also ordered an audit of church finances, "apparently to determine whether or to what

---

[3] Plaintiffs acknowledged in their depositions that they wish for the pastor to be removed. That remedy was not sought in the complaint, and it is not a remedy a court can provide, as plaintiffs also acknowledged in their depositions.

extent the pastor engaged in financial wrongdoing." *Id.* In this regard, the court of appeals observed that:

> Such an inquiry goes to the question of whether the pastor engaged in wrongdoing, rendering him unqualified as a pastor, and whether he should be removed for misconduct. Delving into the need or reason for disciplinary action against a pastor and the issue of whether the church membership should remove him as pastor necessarily requires the court to review ecclesiastical matters.
>
> Procedures for recalling the pastor of the church and for settling disputes with the pastor are encompassed in the church's constitution; the court would be directly interfering with the internal government of the church by forcing the congregation to take action that it has apparently already determined not to take. It is precisely this type of interference with church ecclesiastical matters that is prohibited by the U.S. Constitution. (Citations omitted.) *First New Shiloh Baptist Church* at *3-4.

**{¶ 48}** Although we have some doubt that a request for an accounting of finances necessarily implicates whether a pastor should be removed for misconduct, we are required to follow our prior decision on the basis of stare decisis, which "is designed to provide continuity and predictability in our legal system." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 43. Matters of ecclesiastical abstention are often not clear-cut, and the depositions of the parties (although not cited by the trial court) do indicate a desire to remove the pastor – which implicates an ecclesiastical decision.

**{¶ 49}** Accordingly, the trial court did not err in concluding that it lacked jurisdiction

over the dispute.   The First Assignment of Error is overruled.

### III.   Should the Court have Retained Jurisdiction

### Based on Allegations of Fraud and Collusion?

{¶ 50}    Smith's Second Assignment of Error states that:

The Trial Court Erred in Dismissing the Case for Lack of Subject Matter Jurisdiction, Where the Case Alleged Fraud and Collusion.

{¶ 51}    Under this assignment of error, Smith argues that the trial court should have applied a "fraud and collusion" exception to allow review of ecclesiastical decisions.   According to Smith, although the United States Supreme Court rejected the concept of arbitrariness as an exception in *Serbian Eastern Orthodox Diocese for U. S. of America and Canada v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), the Court did allow fraud and collusion to remain viable as theories upon which jurisdiction over ecclesiastical matters can be grounded.

{¶ 52}    In *Milivojevich*, a defrocked bishop and others brought suit challenging the "mother church's" decision to defrock, as well as its decisions reorganizing the American diocese.   After a lengthy trial, the trial court found no fraud, collusion, or arbitrariness in the decision to defrock the bishop, but concluded that the mother church had acted beyond its power in dividing the American church into three dioceses.   *Id.* at 707-708.   The Illinois Supreme Court affirmed in part and reversed in part, concluding that the bishop's removal and defrockment was " 'arbitrary' because the proceedings resulting in those actions were not conducted according to the Illinois Supreme Court's interpretation of the Church's constitution

and penal code * * *." *Id*. at 708. The Illinois Supreme Court also concluded that the "reorganization was invalid because it was beyond the scope of the Mother Church's authority to effectuate such changes without Diocesan approval." *Id.* On further appeal, however, the Supreme Court of the United States reversed.

**{¶ 53}** To begin, the Supreme Court of the United States remarked that "[t]he fallacy fatal to the judgment of the Illinois Supreme Court is that it rests upon an impermissible rejection of the decisions of the highest ecclesiastical tribunals of this hierarchical church upon the issues in dispute, and impermissibly substitutes its own inquiry into church polity and resolutions based thereon of those disputes." *Id.* The Supreme Court noted that "[t]he principles limiting the role of civil courts in the resolution of religious controversies that incidentally affect civil rights were initially fashioned" in *Watson*, 13 Wall. 679, 20 L.Ed. 666. *Milivojevich* at 710. Quoting *Watson*, the Court stressed that:

> "The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have

them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for." *Milivojevich*, 426 U.S. at 710-711, 96 S.Ct. 2372, 49 L.Ed.2d 151, quoting *Watson* at 728-229.

{¶ 54} The Supreme Court noted that it had subsequently applied this principle in *Gonzalez v. Archbishop*, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929), which involved a dispute over entitlement to income under a will, the resolution of which depended on "an ecclesiastical determination as to whether an individual would be appointed to a chaplaincy in the Roman Catholic Church." *Id.* at 711. In deciding this issue, the Supreme Court had held in *Gonzalez* that " '[i]n the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise.' " *Milivojevich* at 711-712, quoting *Gonzalez* at 16.

{¶ 55} However, *Milivojevich* discounted *Gonzalez's* "exception" as dictum. In this regard, the Supreme Court stated that:

[S]ince there was "not even a suggestion that (the Archbishop) exercised his authority (in making the chaplaincy decision) arbitrarily," 280 U.S., at 18, 50 S.Ct., at 8, the suggested "fraud, collusion, or arbitrariness" exception to the *Watson* rule was dictum only. And although references to the suggested exceptions appear in opinions in cases decided since the *Watson* rule has been held to be mandated by the First Amendment, no decision of this Court has given

concrete content to or applied the "exception." (Footnote omitted.) *Milivojevich* at 712.

{¶ 56}  The Supreme Court went on, however, to state that "whether or not there is room for 'marginal civil court review' under the narrow rubrics of 'fraud' or 'collusion' when church tribunals act in bad faith for secular purposes, no 'arbitrariness' exception in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Milivojevich*,  426 U.S. at 713, 96 S.Ct. 2372, 49 L.Ed.2d 151.  In a footnote, the court also stressed that no issue of fraud or collusion was involved in the case before it.  *Id.* at 713-714, fn. 7.

{¶ 57}  Thus, the Supreme Court of the United States has not specifically rejected a fraud or collusion exception; instead, the Court left room for "marginal civil court review" in such situations.  This comment has been interpreted to mean that "the Court was clearly taking a firm position in protecting First Amendment rights by forbidding inquiry into the ecclesiastical decisions of a church absent extraordinary circumstances." *Heard v. Johnson*, 810 A.2d 871, 881 (D.C.2002), citing  *Hutchison v. Thomas*, 789 F.2d 392 (6th Cir.1986).  In both *Heard* and *Hutchinson*, the matters in question involved the ouster of a minister.  *Heard* at 875-876; *Hutchinson* at 392.

{¶ 58}  Prior to the decision in *Milivojevich,* the Seventh District Court of Appeals applied the arbitrariness, fraud, and collusion exception in a case involving whether or not a

parish priest should be removed or retained. See *Dragelevich v. Rajsich,* 24 Ohio App.2d 59, 263 N.E.2d 778 (7th Dist.1970). The court of appeals concluded that the decision to retain the priest "was made in accordance with the by-laws of this congregation and with the constitutions of both the Diocese and the Serbian Orthodox Church," and that there was no evidence that the decision "was either fraudulent, collusive or arbitrary * * *." *Id.* at 67.

{¶ 59} In a decision issued after *Milivojevich,* the Seventh District Court of Appeals again cited the exception in a case in which the plaintiffs sought to have the pastor removed. *Hatchett v. Alpha & Omega First Baptist Church, Inc.*, 7th Dist. Mahoning No. 77 C.A. 120 , 1978 WL 215051 (Sept. 28, 1978). Citing *Dragelevich* and the arbitrariness, fraud, and collusion exception, the court of appeals held that the plaintiffs had the right to submit to the vote of the entire congregation one of two proposals: (1) that the original election of the pastor was unconstitutional and unlawful, and that the pastorship was, therefore, vacant; or (2) that the pastor's services would be terminated 90 days after passage of the second proposal. *Id.* at *10-11. In this regard, the court of appeals concluded that decisions on the pastor's removal had to be made by the church in the first instance. *Id.* at *11.

{¶ 60} Our own district also considered *Milivojevich* in a case involving the alleged wrongful disfellowship of a member by the church elders. *See Bates v. Kingdom Hall of the Congregation,* 2d Dist. Montgomery No. 9510, 1986 WL 2899, *1 (March 6, 1986). The trial court had dismissed the action for lack of subject matter jurisdiction, and we affirmed in part and reversed in part.

{¶ 61} With respect to the claim of disfellowship, we quoted the part of *Milivojevich* that discusses the possibility of marginal civil court review. *Id.* at *1. We also focused on the

fact that " 'it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria. Constitutional concepts of due process, involving secular notions of "fundamental fairness" or impermissible objectives, are therefore hardly relevant to such matters of ecclesiastical cognizance.' " *Id.* at *2, quoting *Milivojevich*, 426 U.S. at 715, 96 S.Ct. 2372, 49 L.Ed.2d 151.

{¶ 62}    We then concluded that the plaintiff failed to state a claim.   In this regard, we said that:

> It was admitted that it was the elders who disfellowshipped appellant, although appellant claims they acted beyond the scope of their authority in doing so.   Appellees deny that they acted beyond the scope of their authority and further allege that the Watchtower Tract and Bible Society (the body to which the church is subordinate and the highest judicatory of this hierarchy) upheld the elders' action.   Despite the lack of any elements of proof which would support a finding of fact to this effect (e.g. affidavits) we find that the trial court correctly dismissed appellant's complaint as it relates to his claims that he was wrongfully disfellowshipped for the reason that the complaint fails to state a claim upon which relief can be granted.

> We believe that from the allegations made and the facts placed in issue, the evidence will prove one of several scenarios under each of which the court would be without subject matter jurisdiction.   The possible proofs, and the reason why the court would lack jurisdiction to grant relief are as follows: 1. The elders did not exceed their powers, appellant appealed their decision to the highest

judicatory and the highest judicatory affirmed the disfellowship. Under [*Milivojevich*], as discussed above the trial court would lack the subject matter jurisdiction to review the proceedings and decision. 2. The elders exceeded their authority, appellant appealed, but the highest judicatory none the less ratified the elders' decision. Again, under [*Milivojevich*] the court would lack subject matter jurisdiction. 3. The elders did not exceed their authority, but the highest judicatory has not ruled on the matter or 4. The elders did exceed their authority, but again, the highest judicatory has not ruled on the matter. In either of these last two situations, appellant would still have an avenue of relief open to him within the church hierarchy. Thus his action in the civil court would be premature and not ripe for resolution. In such a situation the court would lack subject matter jurisdiction. *Bates,* 2d Dist. Montgomery No. 9510, 1986 WL 2899, at *2-3.

{¶ 63} In contrast, we concluded that the trial court erred in dismissing the plaintiff's claim for slander. With respect to the slander claim, we noted that:

Although at first appearance the resolution of this matter appears on its face to be subject to the very same dangers set forth in [*Milivojevich*], we find that that might not necessarily be the case. Appellant has clearly set forth a legally recognized claim for relief. The claims of privilege as a defense are limited to those privileges which are recognized at law. These plus the other defenses may be determinable without having to resolve ecclesiastical questions. This will require some elements of evidence. Not knowing what, if anything, was said, the

context in which it was spoken, or the degree of any ecclesiastical aspects thereof, dismissal of the slander claim was premature. *Id.* at \*3.

{¶ 64} Our research has disclosed a limited number of out-of-state cases that have considered the fraud and collusion exception. Some courts have not rejected it completely, but have generally found it was not appropriate under the facts of the particular case. *See, e.g., Monahan v. Sims*, 163 Ga.App. 354, 360, 294 S.E.2d 548 (1982) (no evidence of collusion or fraud); *Martin v. Lewis*, 688 S.W.2d 72, 73 (Tenn.App.1984) (election of church members was contested as arbitrary, not fraudulent, and, therefore, could not be challenged); *Abrams v. Watchtower Bible and Tract Soc. of New York, Inc.,* 306 Ill.App.3d 1006, 1013, 715 N.E.2d 798 (1999) (noting that "*Milivojevich* merely leaves open, but does not endorse, the possibility that limited review might be available in cases of fraud or collusion." However, fraud could not inappropriately be found in the case at hand.); *Board of Trustees, Oakley Park Missionary Church v. Michigan Dist. Missionary Church*, Mich. App. No. 234465, 2003 WL 21854519, \*4 (Aug. 7, 2003) (concluding that the Supreme Court left the door open to a fraud exception, but the exception was not warranted based on the facts presented); *Ad Hoc Committee of Parishioners of Our Lady of Sun Catholic Church, Inc. v. Reiss*, 223 Ariz. 505, 224 P.3d 1002, ¶ 26-27 (Div.1 App.2010) (whether or not a fraud exception exists, the asserted fraud could not be considered because it required an examination of church doctrine); *Thibodeau v. American Baptist Churches of Conn.*, 120 Conn.App. 666, 682-684, 994 A.2d 212 (2010) (even where deceit and fraud were alleged, the crux of the complaint was that defendants failed to assist plaintiff in obtaining employment with churches. This is an ecclesiastical matter with which courts do not interfere.)

**{¶ 65}** Other cases have either refused to apply the exception or have expressed reservation about its application. *See Van Osdol v. Vogt*, 908 P.2d 1122, 1133-1134 (Colo.1996) (concluding that the fraud and collusion exception should be rejected on the same basis as arbitrariness, because "[t]he inherently ecclesiastical nature of the choice of a minister is logically inconsistent with a fraud or collusion exception to the First Amendment's bar on judicial review * * *."); *Denny v. Prince*, Vir. Cir. Ct. No. 04-1575, 2005 WL 1939949, *12 (Aug. 8, 2005) (stating that "the fraud and collusion exception, if it exists, applies only to disputes involving hierarchical churches." The court did note that some courts had held out the possibility that it "could apply in a congregational setting." However, precedent of the Virginia Supreme Court precluded this avenue in Virginia.); *Anderson v. Watchtower Bible and Tract Soc. of New York, Inc.*, Tenn. App. No. M2004-01066-COA-R9-CV, 2007 WL 161035, *17-18 (Jan. 19, 2007) (following *Van Osdol's* approach).

**{¶ 66}** Because Ohio courts have concluded that the door for applying the fraud and collusion exception has been left open, we will follow that approach. Nonetheless, we agree with courts which have said that this exception should be applied only in "extraordinary circumstances." *Heard*, 810 A.2d at 881. We say this for two reasons. In the first place, consideration of ecclesiastical matters is generally not permitted, and the exception is a narrow one, based on dictum that the Supreme Court of the United States has never applied. As an additional matter, *Hosanna-Tabor*, ___ U.S. ___, 132 S.Ct. 694, 181 L.Ed.2d 650, a rare unanimous decision of the United States Supreme Court, takes a quite restrictive approach to court intervention in ecclesiastical matters. The Court did say that the ministerial exception bar is an affirmative defense, not a jurisdictional bar. *Id.* at 709, fn. 4.

{¶ 67} There are no extraordinary circumstances in the case before us. The fraudulent conduct alleged in the complaint is wrongful concealment of financial misappropriation of Mt. Carmel's funds. Again, in essence, this is a claim of misconduct on the part of the pastor. If the members of the church are aggrieved by the pastor's conduct, the constitution provides a remedy. The chairman of deacons or any member of the congregation in good standing may initiate charges against the pastor. A 90-day period then ensues for resolution of the grievance. If the charge is not resolved, the chairman or any member may call for a meeting of the congregation to consider the pastor's termination. *See* Article VIII, Section 2 of the Mt. Carmel Constitution. There is no indication that Smith attempted to follow this process.

{¶ 68} Ex. 2 attached to the Third Verified Complaint is a letter from an attorney representing a committee of 30 members of Mt. Carmel. The letter, which is dated September 1, 2010, expresses concerns about White's lack of personal and professional integrity, and invokes a request for a special meeting, pursuant to Article VII, Section 1(D) of the constitution. This section of the constitution permits members to request a special meeting to discuss items set forth in the notice.

{¶ 69} The letter lists several areas of deficiency on White's part, including lack of professional and personal accountability and commitment; lack of financial transparency and accountability; unilateral decision-making and failure to communicate; demeanor-related shortcomings; incorrect conduct regarding the funeral of a late-deacon; instructional and doctrinal deficiencies; and lack of personal integrity. The letter states that "In closing, Pastor White's habitual negligence toward his assigned duties, his ethical lapses, his alleged moral lapses, his negative attitude toward many Members, and his steadfast refusal to address these

concerns have called into question his fitness to lead Mount Carmel. * * * Any breach [of White's employment] contract, including the By-laws, can be grounds for termination."  Ex. 2, pp. 8-9.

{¶ 70}    In accordance with the request, a special meeting was held in October 2010. However, instead of following up under Article VIII, Section 2, to request White's termination, Smith filed suit, asking for a financial accounting.

{¶ 71}    Accordingly, the Second Assignment of Error is overruled.


IV.   Was Dismissal Appropriate Because Members

Failed to Follow Internal Procedures?

{¶ 72}    Smith's Third Assignment of Error states that:

The Trial Court Erred in Dismissing the Case for Lack of Subject Matter Jurisdiction, Where the Church Members Tried to Use Internal Church Procedures.

{¶ 73}    Under this assignment of error, Smith contends that the trial court erred in concluding that he failed to exhaust internal church procedures before filing this action.  Smith argues that exhaustion of remedies is not a jurisdictional prerequisite.  In addition, Smith focuses, again, on the contention that he is not seeking White's removal, but is only requesting a financial accounting.  Finally, Smith contends that he attempted to exhaust internal remedies, but was rebuffed.

{¶ 74}    In its decision, the trial court cited *First Baptist Church of Glen Este v. State of Ohio,* 591 F.Supp. 676 (S.D.Ohio 1983), in support of the proposition that failure to follow

internal procedures is fatal to the claims of individual church members and to the court's jurisdiction. In that case, the federal district court stated that "Civil courts must insure that an aggrieved church member has exhausted all internal 'rights of appeal' before any inquiry is made into internal church matters. Only after such appeal rights have been exhausted can a court determine that the highest church judicatory body has spoken on the matter." *Id.* at 683. This is consistent with the holding in *Tibbs*, 93 Ohio App.3d 35, 637 N.E.2d 397.

{¶ 75} The Eighth District Court of Appeals concluded in *Tibbs* that the trial court lacked jurisdiction over the plaintiffs' claim for breach of fiduciary duty, because the claim required inquiry into ecclesiastical matters. *Id.* at 44. The court of appeals also held that the trial court lacked jurisdiction over the plaintiffs' breach of contract claim because: (1) the matter involved an inquiry into ecclesiastical matters; and (2) the plaintiffs failed to comply with internal church procedures. *Id.* at 45. In this regard, the court of appeals observed that:

> Thus, while appellants correctly argue that civil courts have jurisdiction to determine whether the appropriate church authority made a decision concerning a pastor's termination or retention, appellants would have this court intervene and make this decision for the appropriate Church authority. To the contrary, the present case does not require the lower court to determine whether the pastor's termination was made by the appropriate church authority, since such decision has never been made. The decision in the present case was never reached, nor was a meeting even called to determine such issues. (Citations omitted.) *Id.*

{¶ 76} A congregational church like Mt. Carmel "is governed by whatever constitution, rules, and processes it has put in place for itself. However, a congregational church is not

granted the 'unbridled right to disregard and to violate the provisions of [its] own written by-laws or constitutions.' " *Calvary Congregational Church, Inc. v. Eppinger,* 8th Dist. Cuyahoga No. 75011, 2000 WL 193216, *1 (Feb. 17, 2000), quoting *Randolph v. First Baptist Church of Lockland,* 68 Ohio Law Abs. 100, 105, 120 N.E.2d 485 (C.P.1954). "A civil court retains jurisdiction 'to determine whether the decision concerning "who shall preach from the pulpit" was made by the proper church authority.' " *Eppinger* at *1, quoting *Tibbs* at 42.

{¶ 77} We have already stressed that Smith failed to follow internal church procedures for requesting White's termination or for initiating a grievance with respect to the concerns of the dissenting members. We agree with Smith that the Supreme Court of Ohio has indicated that "the doctrine of failure to exhaust administrative remedies is not a jurisdictional defect to a declaratory judgment action; it is an affirmative defense that may be waived if not timely asserted and maintained." (Citations omitted.) *Jones v. Chagrin Falls*, 77 Ohio St.3d 456, 462, 674 N.E.2d 1388 (1997). However, the court also stressed in *Jones* that:

> [O]ur holding is not to be read as a rejection of the force of the doctrine requiring exhaustion of administrative remedies in general. We agree with the United States Supreme Court and the courts of the many jurisdictions that have echoed the words of *Myers v. Bethlehem Shipbuilding Corp.* (1938), 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638, 644: "[It is] the long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."
>
> *Jones* at 462.

{¶ 78} No matter how the issue is characterized, Smith never followed the procedures

listed in the governing church documents for resolving the matters at hand. This should have been done before any potential court actions were initiated. We also do not agree with Smith that resort to the internal church procedures would have been futile. This is an issue that cannot be assessed until compliance with proper procedures has occurred.

{¶ 79} Accordingly, the Third Assignment of Error is overruled.

## V. Conclusion

{¶ 80} All of Smith's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

HALL, J., concurs.

FROELICH, P.J., concurring in part and dissenting in part:

{¶ 81} I would affirm the trial court's dismissal of the claims for breach of fiduciary duty, conversion, civil conspiracy, unjust enrichment, and breach of contract; I would reverse the dismissal of the fraud count and the demand for an accounting.

{¶ 82} The Complaint is specifically for Breach of Fiduciary Duty (Count I), Conversion (Count II), Civil Conspiracy (Count III), Unjust Enrichment (Count IV), Fraud (Count V), and Breach of Contract (Count VI). The prayer for relief demanded that the defendants be compelled to account for "all money and property which has come into their hands," that defendants "account for all monies received by them upon the sale of the * * * manse," that there be "an accounting so that damages * * * may be ascertained," that the defendants "be ordered to account for all sums of money received by them," and that they be "enjoined from diverting assets."

**{¶ 83}** "Claims for breach of fiduciary duty require proof of the following elements: '(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom.' *Harwood v. Pappas & Assoc., Inc.,* 8th Dist. Cuyahoga No. 84761, 2005-Ohio-2442, ¶ 26, citing *Strock v. Pressnell*, 38 Ohio St.3d 207, 216, 527 N.E.2d 1235 (1988). A 'fiduciary duty' is defined as ' "[a] duty of utmost good faith, trust, confidence, and candor owed by a fiduciary * * * to the beneficiary * * *; a duty to act with the highest degree of honesty and loyalty toward another person and in the best interests of the other person." ' *DiPasquale v. Costas*, 186 Ohio App.3d 121, 151, 2010-Ohio-832, 926 N.E.2d 682, ¶ 122 (2d Dist.), quoting *In re Trust of Bernard*, 9th Dist. Summit No. 24025, 2008-Ohio-4338, ¶ 20, which in turn quotes Black's Law Dictionary 545 (8th Ed. 2004)." *Kademian v. Marger*, 2d Dist. Montgomery No. 24256, 2012-Ohio-962, ¶ 57.

**{¶ 84}** The trial court cited *State ex rel. First New Shiloh Baptist Church v. Meagher*, 1st Dist. No. C-960371, 1997 WL 180266 (April 16, 1997), for the proposition that there is no jurisdiction "over claims brought by the individual members of the congregation seeking to oust the pastor or hold the board liable for a breach of fiduciary duty to the congregation." *Id*. I agree that whether a cleric or any church member has violated fiduciary duties to his or her congregation – let alone whether such violation should result in termination of employment or expulsion from the church – is a matter not within the subject matter jurisdiction of a secular court.

**{¶ 85}** I do not agree that a secular court's ordering an accounting necessarily will, or even could, lead to a conclusion *by the court* of "wrongdoing" or breach of fiduciary duty by the defendants; these are conclusions that would be made by the religious hierarchy – if it/they even

consider the accounting.

**{¶ 86}** We do not need to overrule our case of *Robinson v. Freedom Faith Missionary Baptist Church*, 2d Dist. Montgomery No. 20232, 2004-Ohio-2607, to permit a request for an accounting to proceed in this case. In *Robinson*, the plaintiff – an ordained deacon and chairman of the deacon's ministry of the church – demanded an audit and accounting of the church's financial records, accounts and transactions, claiming that the church's treasurer and secretary were not properly accounting for the church's money and that funds may have been diverted for personal use. *Id*. at ¶ 12. When informed of the issue, the pastor told the plaintiff that he was going to appoint his mother, who worked for an accounting company, to act as the church's bookkeeper. *Id.* at ¶ 13. The plaintiff claimed that the secretary, treasurer, and pastor breached their fiduciary duty to act in the best interest of the church. *Id.*

**{¶ 87}** Addressing whether the trial court properly dismissed the action as an ecclesiastical matter (which we held it did), we discussed the First District's case of *First New Shiloh*, in which claims were brought against a pastor for breach of fiduciary duty. The First District had held that "if the trial court had ordered an accounting of the church finances to determine whether the pastor had been engaged in wrongdoing, the heart of the inquiry would be whether or not the pastor should be removed, which is an ecclesiastical issue." *Robinson* at ¶ 28. Discussing *First New Shiloh*, we stated (quoting the trial court) that the deacon had "made an allegation of breach of fiduciary duty and seeks an accounting of church finances. This inquiry would necessarily involve whether the pastor of the Church engaged in wrongdoing, and therefore, whether he should be removed as pastor." *Id*. at ¶ 29.

**{¶ 88}** Our prior opinion in *Robinson* does not hold that an accounting is *always*

"ecclesiastical in nature," only that it was in the context of the facts and allegations before it, namely where the claim concerned a breach of fiduciary duty by the pastor concerning fiscal wrongdoing and the plaintiffs sought to remove the pastor for that conduct.

**{¶ 89}** Based on the 158-paragraph complaint involved in this case – the allegations of which are presumed to be true in a Civ.R. 12(B)(1) motion – the demand for an accounting is secular. As noted by the majority opinion, the plaintiffs in the case before us have not asked, as a remedy in the civil action, that the pastor be removed. The Mt. Carmel constitution provides a procedure for the pastor's removal, and the potential issue of what action, if any, to take against the pastor based on the results of an accounting is an issue that is not within the jurisdiction of a secular court and can be addressed outside of this civil action; this is not inconsistent with our decision in *Robinson*.

**{¶ 90}** Regarding the "fraud or collusion" exception, I would find that it is premature for this court to find that "extraordinary circumstances" do not exist. "A claim for common-law fraud requires proof of the following elements: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. *Cohen v. Lamko, Inc.* (1984), 10 Ohio St.3d 167, 169, 10 OBR 500, 462 N.E.2d 407; *Collins v. Natl. City Bank*, Montgomery App. No. 19884, 2003-Ohio-6893, 2003 WL 22971874, ¶ 39." *Sutton Funding L.L.C. v. Herres*, 188 Ohio App.3d 686, 2010-Ohio-3645, 936 N.E.2d 574, ¶ 49 (2d Dist.).

**{¶ 91}** As in *Bates v. Kingdom Hall of the Congregation*, 2d Dist. Montgomery No. 9510, 1986 WL 2899 (March 6, 1986), where there "were no items of an evidentiary nature before the court," *id*. at * 1, the trial court herein did not address any factual issues. The plaintiffs have "set forth a legally recognizable claim" for relief that, depending on the evidence, "may be determinable without having to resolve ecclesiastical questions." *Id*. at * 3.

**{¶ 92}** What "extraordinary circumstances" are and whether they exist in the plaintiffs' case should be determined after discovery and an appropriate motion. Similarly, again without any factual determinations, the defense that the plaintiffs did not comply with and exhaust internal church procedures or that such efforts would have been "futile" should have survived the Civ.R. 12(B)(1) motion.

**{¶ 93}** Contrary to what the defendants contend, the count for fraud and the demand for an accounting do not ask the court to decide whether the defendants have met the "standards of the congregation" or who "will preach from the pulpit." And an accounting and fraud involve neutral principles of law, developed for use in all property disputes, which can be applied without "'establishing' churches to which property is awarded." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969).

**{¶ 94}** I would hold that whether there was a breach of a duty owed to the plaintiffs (Count I), whether the defendants' actions wrongfully resulted in their obtaining property to which they were not entitled (Count II), whether the defendants conspired to harm the plaintiffs (Count III), whether any enrichment of the defendants was unjust (Count IV), and whether a contract was breached by the actions of the defendants (Count VI), are issues that must be

addressed internally by the defendants; and thus that a secular court does not have jurisdiction to hear.   However, an accounting and whether certain defendants subjectively sought to defraud the plaintiffs are impartial, objective concepts, detached from any ecclesiastical concerns.

. . . . . . . . . .

Copies mailed to:

Gretchen M. Treherne
Kirstie N. Young
Gordon D. Arnold
Patrick J. Janis
Hon. Mary Katherine Huffman