[Cite as *Mt. Pilgrim Baptist Church, Inc. v. Bishop*, 2015-Ohio-5161.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Mt. Pilgrim Baptist Church, Inc., et al.　　　Court of Appeals No. L-14-1206

　　　　Appellants　　　　　　　　　　　　Trial Court No. CI0201105815

v.

Raymond G. Bishop, Jr.　　　　　　　　**DECISION AND JUDGMENT**

　　　　Appellee　　　　　　　　　　　　Decided:　December 11, 2015

* * * * *

David A. Bryan and Nathan H. Zechman, for appellants.

Stuart J. Goldberg, Jeffrey M. Stopar, and Neema M. Bell, for appellees.

* * * * *

**YARBROUGH, P.J.**

## I. Introduction

**{¶ 1}** Appellants, Mt. Pilgrim Baptist Church, Inc., Robert Newton, Nathan Willis, and R.T. Braddy, appeal the judgment of the Lucas County Court of Common Pleas, granting appellee's, Raymond Bishop, Jr., motion to dismiss. For the reasons that follow, we affirm.

## A. Facts and Procedural Background

{¶ 2} The background facts relevant to our disposition of this appeal, as set forth in appellants' complaint and otherwise contained in the record, are as follows:

### i. Initial Governance Documents of Mt. Pilgrim Baptist Church

{¶ 3} Mt. Pilgrim Baptist Church, Inc. is a nonprofit corporate congregational church located in Toledo, Ohio. Bishop has been the pastor of the church since 1990. Until somewhat recently, the church's operations were governed by its Articles of Incorporation and a document entitled "Preamble," which appears to be a set of bylaws for the church. Notably, the Preamble states that the government of the church "is vested in the body of believers who compose it. It is subject to the control of no other ecclesiastical body." Further, the Preamble establishes several offices within the church including, among others, a pastor, deacons, and trustees. Under the Preamble, the deacons are the "helpers, counselors and assistants to the pastor." Likewise, the trustees are charged with carrying out the "directions of the pastor and the church that have been voted and adopted by the majority membership."[1] Amendment of the Preamble was

---

[1] Membership is discussed in the Preamble as follows:

E. MEMBERSHIP
Section One – Candidacy

(a) Any person professing faith in our Lord Jesus Christ shall be eligible for reception as a candidate for membership.

* * *

Section Three – Voting Rights of Members

expressly provided for within the document, which permitted amendments, additions, or repeal of the Preamble by a vote of "at least two-thirds of the members present at the annual business meetings."[2]

{¶ 4} At the time of Bishop's hiring, the church's business and financial affairs were managed by the trustees. According to the Preamble, the trustees were responsible for holding title to the church's property in trust. In addition, the Preamble states that the function of the trustees was to "affix their signatures to legal documents involving the sale, mortgage, purchase, or rental of property, or other legal documents where the signature of trustees is required." However, the Preamble is careful to note that the trustees "have no power to buy, sell, mortgage, lease or transfer any property without a specific vote of the Church authorizing each action."

{¶ 5} Over time, the trustees stopped meeting, eventually disbanding in 1998. Thereafter, the deacons began managing the business and financial affairs of the church under Bishop's supervision.

### ii. Events Preceding the Filing of Appellants' Complaint

{¶ 6} In 2000, the Board of Deacons approved the purchase of a Volvo automobile for Bishop's personal use. Three years later, Bishop, acting on behalf of the church, purchased a $58,000 Mercedes-Benz E Class automobile for his personal use. Bishop did

---

    (a) Only members in good and regular standing of the Church shall be eligible to vote in the Church business meetings.

[2] Pursuant to Section G of the Preamble, annual business meetings were to be held in December with prior notice given to the membership by the pastor from the pulpit.

not inform the Board of Deacons of his intent to purchase the Mercedes-Benz automobile, nor did he obtain the Board's consent prior to completing the purchase. Likewise, in 2005, Bishop obligated the church to pay for a $48,000 Lexus GS 300 that he purchased without the knowledge and consent of the Board of Deacons.

{¶ 7} Meanwhile, in 2004, the church obtained a credit card for Bishop and certain members of the Board of Deacons to use for church business. The use of the church credit card appears to have continued without incident for many years. However, in 2009, the Board of Deacons was notified that Bishop purchased $4,000 in furniture for his son using the church's credit card. Although Bishop asserted that his use of the credit card was justified, he eventually reimbursed the church for the cost of the furniture out of his own funds.

{¶ 8} In addition to his alleged misuse of the church's credit card, Bishop also transferred title to the 2000 Volvo and 2003 Mercedes-Benz to himself. Bishop allegedly failed to seek the Board of Deacons' permission to transfer the vehicles.

{¶ 9} Once his conduct was discovered, Bishop transferred the vehicles back to the church. Nonetheless, the Board of Deacons hired an attorney to investigate Bishop's handling of church funds. Pursuant to this investigation, the Board's attorney made written requests to Bishop for certain information and documents. According to the complaint, Bishop failed to respond to the written requests, and has refused to comply with the Board of Deacons' instruction to relinquish control of the aforementioned automobiles.

4.

{¶ 10} In June 2010, the Board of Deacons formed a task force charged with developing an employee handbook and other governance documents. Additionally, the Board began working toward the adoption of a code of regulations to govern the church. Six months later, the Board approved a code of regulations and submitted it to the task force to be presented to the congregation at its January 25, 2011 annual meeting. The code of regulations and the employee handbook were conditionally adopted by the congregation at the 2011 annual meeting with the stipulation that the congregation would be permitted to review the documents and revisit the issue at the next annual meeting.

{¶ 11} Under the code of regulations, the Board of Deacons is granted broad powers over the administration of the church. Specifically, the board is empowered to "direct all Church business and affairs and control its property." Concerning the oversight of Bishop, the code of regulations provides, in relevant part:

The Deacons, acting as a Board shall have powers:

(a) To fix, define and limit the powers and duties of all officers, and to fix the salaries of all officers and employees;

(b) To appoint, remove or suspend, with or without cause, any officer, agent or employee of the Church as they deem advisable, and to determine their duties and fix their compensation.

{¶ 12} Moreover, the code of regulations delineates the role, responsibilities, and authority of Bishop as the pastor of the church as follows:

5.

**ARTICLE V: EMPLOYEES**

1. Pastor. The Board of Deacons, acting for the Church, shall employ a pastor to direct and be responsible for the spiritual affairs of the Church, in accordance with the terms and conditions of employment set forth in the Mt. Pilgrim Employee Policy Manual.

2. Authority of Pastor. The pastor shall have the authority to handle his immediate staff within the budget approved by the Mt. Pilgrim Finance Committee. The pastor shall have no authority or responsibility over any other program operated under aegis of the Church or in conjunction with the Church * * *.

{¶ 13} Regarding changes to the code of regulations, Article VIII provides: "These Regulations may be amended or repealed at any meeting of members called for that purpose by the affirmative vote of the majority of the members present." In that regard, the code of regulations further provides that "[t]he members present at any meeting shall constitute a quorum." Moreover, the code of regulations states: "A simple majority of voting members shall be required to take any action."[3]

{¶ 14} Following the provisional adoption of the code of regulations, and in light of Bishop's noncompliance with the Board of Deacons' requests for information, the Board of Deacons met on June 28, 2011, and July 5, 2011, and ultimately decided to

---

[3] Notably, the term "member" is not defined in the code of regulations.

terminate Bishop's employment.  Thereafter, the Board of Deacons drafted a letter of termination, which was hand-delivered to Bishop at his personal residence.

{¶ 15} Two days after receiving the letter of termination, Bishop sent a response letter to the Board of Deacons, refusing to acknowledge the Board of Deacons' authority to terminate his employment in light of his understanding that the congregation appointed him as the "leader of the Church in all areas" at the January 25, 2011 annual meeting.  On the following Sunday, Bishop appeared before the church and proceeded to the pulpit, where he called for a meeting of church members to discuss his termination.  At that meeting, which was videotaped and placed into the record in this case, Bishop asked to be declared the leader of the church by its members and to have the code of regulations promulgated by the Board of Deacons dissolved.  Having apparently received the consent of the members present at the meeting, Bishop proceeded to exercise his authority as leader of the church by dismissing the members of the Board of Deacons from their positions.

### iii.  The Filing of the Complaint

{¶ 16} In light of the foregoing, the church, joined by Newton, Willis, and Braddy, filed their complaint against Bishop in this action on October 4, 2011.  The individual appellants were members of the church's Board of Deacons.  Citing a resolution passed by the Board of Deacons, the individual appellants alleged that they were authorized to file the present action on behalf of Mt. Pilgrim Baptist Church, Inc.

{¶ 17} In their complaint, appellants sought the following:

7.

(1) a judgment declaring that the January 25, 2011 code of regulations was validly enacted and that the Board of Deacons established thereunder had the authority to manage the church and its finances;

(2) a judgment declaring that Bishop's employment was properly terminated by the Board of Deacons on July 6, 2011;

(3) a finding that Bishop was liable for trespass as a result of his continued performance of church duties without the consent of the church following the termination of his employment;

(4) a determination that Bishop was liable for conversion for refusing to return the church's automobiles, namely the 2000 Volvo, 2003 Mercedes-Benz, and 2006 Lexus;

(5) a judgment that Bishop misappropriated church funds by, among other things, using the church credit card for personal use, transferring ownership of the automobiles, and using church funds to pay off the outstanding loans on the vehicles;

(6) an accounting of all transactions made by Bishop using church monies; and

(7) a finding that Bishop was estopped from denying the authority of the Board of Deacons under the January 25, 2011 code of regulations because he proposed the code of regulations to the congregation, benefitted from the code of regulations when he subsequently negotiated a compensation package with the

8.

Board of Deacons and purchased a parsonage from the church for the balance owing under the mortgage under the authority of the code of regulations.

### iv. Bishop's First Motion to Dismiss

{¶ 18} Two weeks after appellants filed their complaint, Bishop responded by filing a "Motion to Dismiss Complaint Based on Lack of Subject Matter Jurisdiction" under Civ.R. 12(B)(1). In his motion, Bishop argued that the trial court lacked subject matter jurisdiction because the issues raised in the complaint regarding "the authority of a Deacon Board to terminate a Pastor" were ecclesiastical issues barred by the First Amendment to the United States Constitution under the ecclesiastical abstention doctrine.

{¶ 19} In response to Bishop's motion to dismiss, appellants filed a memorandum in opposition, in which they asserted that the trial court was not barred from exercising subject matter jurisdiction over this case because the issues involved were purely secular. Specifically, appellants contended that the relief sought in their complaint was limited to the court's enforcement of the decision of the Board of Deacons dismissing Bishop as pastor of the church. Appellants contrasted their articulation of the issue with Bishop's by urging that the issue was not whether Bishop *should* be terminated, but rather, whether he *was already* terminated.

{¶ 20} On November 21, 2011, the trial court issued its decision on Bishop's motion to dismiss. Upon consideration of the parties' arguments, the trial court found that it possessed subject matter jurisdiction over the case. In so finding, the court stated:

9.

[T]he Court finds that [appellants'] Complaint involves the following issues and that such issues are secular, not ecclesiastical, such that the Court has subject matter jurisdiction over them: 1) what Mt. Pilgrim's governance documents and procedures, if any, are in the first instance; 2) whether the Board is the governing body of and/or has the authority to act on behalf of Mt. Pilgrim pursuant to Mt. Pilgrim's governance documents and procedures, including with respect to the termination of Defendant Bishop; 3) whether the Board actually did terminate Defendant Bishop pursuant to any such authority; and 4) the enforcement of any actions taken by or any property or other legal rights of Mt. Pilgrim itself via the proper church authority.

### v. Adoption of the Church Constitution

{¶ 21} On December 14, 2011, five months after Bishop's dismissal of the members of the Board of Deacons, and one month after the trial court denied Bishop's motion to dismiss, the church held its annual meeting at which the congregation was to finally decide on the adoption of the code of regulations that was initially presented and provisionally approved at the January 25, 2011 meeting. The record contains a video recording of the December 14, 2011 annual meeting. At that meeting, the code of regulations was not adopted. Instead, a majority of the members of the congregation present at the meeting voted to adopt a new governance document, entitled the

"Constitution of Mt. Pilgrim Baptist Church, Inc." (the "Church Constitution"), the material provisions of which were summarized at the meeting.[4]

{¶ 22} The Church Constitution is a 25-page document that contains a mixture of seemingly secular provisions and patently religious material including numerous biblical references. Relevant here, the introductory material in the Church Constitution provides that any provisions contained therein that are deemed to be inconsistent with "the Word of God, the Articles of Incorporation of the Church or Ohio Law shall be deemed absolutely null and void." Further, the management authority for the church is vested in the Senior Pastor and a Board of Ministry Directors under the express terms of the Church Constitution. The Senior Pastor is also the President, Chief Executive Officer, and "spiritual leader" of the church.

{¶ 23} Regarding the Senior Pastor's duties, Section 7.01 of the Church Constitution provides, in relevant part:

> The Pastor's duties and responsibilities shall include (but not be limited to) the following:
>
> 1. Oversee the spiritual and temporal affairs of the Church (1 Peter 5);
>
> 2. Teach the Word of God with knowledge and understanding (Luke 4; Jeremiah 3:15);

---

[4] According to an affidavit submitted by appellants, the church has a total of 2,596 members. 273 members attended the December 14, 2011 meeting, and 247 ballots were cast. 164 members, equivalent to 60.07% of those in attendance or 66.40% of those voting, cast ballots in favor of adopting the Church Constitution.

11.

3.  Provide the vision and missional direction of the Church (Habakkuk 2:1-3);

4.  Preach and Proclaim the Word of God (Matthew 28);

5.  Equip believers for the work of the ministry and mature in the Faith (Ephesians 4);

6.  Lead in the spiritual formation of the congregational body (Matthew 28);

7.  Select and supervise the Church staff in accordance with the Word of God, law and operational procedures of the Church;

8.  Perform such other responsibilities of the Senior Pastor as may be set forth in any Pastoral Covenant/Contract;

9.  Select all ministers, preachers, speakers and guest performers and determine honorariums for the same.

10.  Call and act as moderator at all Church business meetings with the exception as outlined in Section 14.02.

{¶ 24} The Board of Ministry Directors is comprised of no less than 3 and no greater than 12 directors who are appointed by the Senior Pastor.  Under the Church Constitution, the Board of Ministry Directors is charged with, among other things, serving as legal custodians of all church property and representing the church in all legal matters.  The Board of Ministry Directors is also the Board of Directors for the church corporation.

12.

**{¶ 25}** In addition to the foregoing provisions, the Church Constitution sets forth a procedure to be followed in order to resolve conflicts concerning the senior pastor. Under Section 14.02 of the Church Constitution,

The Senior Pastor may be dismissed or removed by strict adherence to the following process:

1. A written notice of the intent to terminate the Senior Pastor Covenant/Contract shall be delivered to the Senior Pastor by certified mail, (return receipt requested), signed by a three fourths (3/4) majority of the Board of Ministry Directors, specifying a date and time of a Special Board meeting at the church, thereby requesting the presence of the Senior Pastor to give cause why the Board should either resolve or not proceed with the process of termination;

2. Should the issue of termination be unresolved, then a unanimous vote of the Board of Ministry Directors shall be required to proceed with a recommendation to the Church by providing a two weeks' notice to the church congregation of the pending removal action of the Senior Pastor;[5]

3. Notice of the date and time of the Special Call Meeting shall be given from the pulpit by a member of the Board of Ministry Directors on two (2) consecutive Sundays and two (2) consecutive Wednesdays (i.e.,

---

[5] Notably the congregation was informed during the December 14, 2011 annual meeting that "the senior pastor will not be a voting member when he is the subject of the conflict" and "he has no part in the unanimous vote that will be required."

13.

mid-week service, as applicable) preceding the date of the pending termination action;

4. Approval by three fourths (3/4) of the registered members present at a specially called Church member meeting shall be required to dismiss or remove a Senior Pastor;

5. The Special Call Meeting shall be moderated by someone agreeable to both the Senior Pastor and the Board of Ministry Directors;

6. Should termination [occur,] the Board of Ministry Directors shall with all due diligence:

(a) Identify and make appointment of an interim pastor;

(b) Initiate and implement a pulpit committee;

(c) Resolve and wrap up any remaining issues in connection with the termination of the Senior Pastor Covenant/Agreement.

### vi. Subsequent Trial Court Proceedings

{¶ 26} Following the denial of Bishop's first motion to dismiss and the congregation's adoption of the Church Constitution, Bishop filed his answer in this case, to which he attached a copy of the Church Constitution. In his answer, Bishop asserted several defenses. Specifically, Bishop contended that the trial court lacked subject matter jurisdiction over this case. Further, Bishop urged that appellants lacked standing to bring this case.

14.

**{¶ 27}** Three weeks later, a motion to dismiss was filed on behalf of the church. In the motion, the church asserted that dismissal was proper in light of the congregation's (the supreme governing body for the church) adoption of the Church Constitution, which rendered the individual appellants' claims moot by resolving the issues over which the trial court determined it had jurisdiction, namely the determination of which church governance documents controlled and who possessed the authority to terminate Bishop. Likewise, on January 20, 2012, Bishop filed a second motion to dismiss, in which he argued that the individual appellants lacked standing to pursue the claims raised in the complaint in light of the congregation's adoption of the Church Constitution, which transferred such authority to the Board of Ministry Directors.

**{¶ 28}** In support of its motion to dismiss, the church submitted an affidavit of Delise Simmons, the church's secretary and a director on the Board of Ministry Directors, the governing body established under the Church Constitution. In the affidavit, Simmons authenticated three documents attached thereto. One of these documents, entitled "Unanimous Written Consent of the Board of Ministry Directors of Mt. Pilgrim Baptist Church, Inc.," alleges that the Board of Ministry Directors "reviewed the Complaint * * *and related pleadings and documents and believe that the filing of the same were not properly authorized by the Board or the Church members and that it is not in the best interest of the Church to pursue such litigation." Moreover, the document, which is signed by Bishop and 7 other directors, states that "the Church hereby disavows the Complaint * * * and the actions of the [individual appellants] in filing the same on

15.

behalf of the Church and otherwise naming the Church as a Plaintiff in such proceedings."

{¶ 29} In response to the aforesaid motions to dismiss, appellants, on May 2, 2013, filed a memorandum in opposition in which they argued that the Church Constitution did not receive the required number of votes for passage under the Preamble. As noted above, the Preamble may be amended or repealed by a vote of "at least two-thirds of the members present at the annual business meetings." Apparently construing the adoption of the Church Constitution as an amendment or repeal of the Preamble, appellants asserted that the Church Constitution was not properly adopted since those voting in favor of its adoption at the December 14, 2011 meeting comprised only 60.07% of those in attendance. Additionally, appellants claimed that Bishop and his supporters made "numerous misstatements about the provisions of the Constitution all of which downplayed the total control it conferred upon Bishop over the congregation." Finally, appellants took issue with the voting procedures employed at the December 14, 2011 meeting. In particular, appellants argued that it was improper to allow children who were members of the church to cast a ballot. In addition, appellants contended that the voting procedures violated the terms of the Preamble because Bishop and his supporters failed to tally the total number of members in attendance at the meeting, opting instead to simply count the total number of ballots cast.

{¶ 30} Five days later, Bishop and the church filed a joint reply brief in support of their motions to dismiss. In their brief, the parties asserted that appellants' arguments in

16.

opposition to the motions to dismiss must fail for several reasons. First, Bishop and the church urged that appellants possessed no authority to terminate Bishop under the Preamble, which reserved the authority over the affairs of the church for the congregation as a whole. Thus, Bishop and the church argued that dismissal would be proper even if appellants were correct in claiming that the Preamble was not property repealed. Second, Bishop and the church rejected appellants' contention that the passage of the Church Constitution was tantamount to amending or repealing the Preamble. Rather, they argued that the church can exist with both the Church Constitution and the Preamble.

{¶ 31} Upon consideration of the foregoing arguments, the trial court issued its decision on the motions to dismiss on September 3, 2014. In a comprehensive, 130-page decision, the trial court essentially held that dismissal of appellants' claims was warranted because appellants either lacked standing to raise the claims or the claims were moot, and also because the trial court lacked subject matter jurisdiction over the predominantly-ecclesiastical issues raised in the complaint under the ecclesiastical abstention doctrine. It is from this decision that appellants now appeal.

### B. Assignments of Error

{¶ 32} On appeal, appellants raise the following assignments of error:

First Assignment of Error: The lower court committed reversible error in dismissing Appellants' complaint for lack of subject matter jurisdiction because the relief sought in the complaint only seeks to protect

17.

Church property and enforce secular practices the members chose for themselves.

Second Assignment of Error: The lower court committed reversible error in dismissing Appellants' complaint under the mootness or lack of standing doctrines because it failed to determine whether or not the Church adopted the December 14, 2011 Constitution upon which the finding of mootness and lack of standing relies.

Third Assignment of Error: The lower court committed reversible error in dismissing Appellants' complaint for lack of subject matter jurisdiction because the underlying dispute is over secular issues regarding the Church's property rights and there is no hierarchical body or internal dispute resolution mechanism to which Appellants may address their grievances set out in the complaint filed in the court below.

Fourth Assignment of Error: The lower court committed reversible error in dismissing Appellants' complaint for lack of subject matter jurisdiction because the standards for court review used by the lower court to dismiss Appellants' complaint if adopted by this Appellate Court will lessen the rights of the members of Mt. Pilgrim Baptist Church to govern themselves because they will have no recourse against the use of deception, fraud and physical force to deprive them of the right to freely choose the manner in which they practice their religion.

18.

{¶ 33} Because all of appellants' assignments of error challenge the trial court's dismissal of this case under Civ.R. 12(B)(1), and since they are not separately argued in appellants' brief, we will address them simultaneously.

## II. Analysis

{¶ 34} We review trial court judgments regarding Civ.R. 12(B)(1) motions to dismiss for lack of subject-matter jurisdiction de novo. *Dargart v. Ohio Dept. of Transp.*, 171 Ohio App.3d 439, 2006-Ohio-6179, 871 N.E.2d 608, ¶ 12 (6th Dist.). The standard for dismissal pursuant to Civ.R. 12(B)(1) is "whether any cause of action cognizable by the forum has been raised in the complaint." *State ex rel. Bush v. Spurlock*, 42 Ohio St.3d 77, 80, 537 N.E.2d 641 (1989).

{¶ 35} Here, appellants contend that the trial court erred in finding that the issues raised in this case are ecclesiastical in nature and, thus, outside the court's subject matter jurisdiction. Further, they assert that the trial court erroneously concluded that they lack standing to pursue the claims contained in the complaint or that the claims are moot following the congregation's alleged adoption of the Church Constitution.

{¶ 36} "It is well established that civil courts lack jurisdiction to hear or determine purely ecclesiastical or spiritual disputes of a church or religious organization." (Citations omitted.) *Tibbs v. Kendrick*, 93 Ohio App.3d 35, 41, 637 N.E.2d 397 (8th Dist.1994). This is known as the ecclesiastical abstention doctrine.

{¶ 37} Ohio appellate courts, in summarizing principles espoused from a long line of United States Supreme Court precedent dating back to 1871, have articulated the

19.

ecclesiastical abstention doctrine as a two-part test used to determine whether a court has subject matter jurisdiction over a church dispute. In the first step, courts must determine whether the organization is hierarchical or congregational. *Bhatti v. Singh*, 148 Ohio App.3d 386, 2002-Ohio-3348, 773 N.E.2d 605, ¶ 25 (2d Dist.). "A hierarchical polity exists when 'the religious congregation * * * is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization.'" *State ex rel. Morrow v. Hill*, 51 Ohio St.2d 74, 76, 364 N.E.2d 1156 (1977), quoting *Watson v. Jones*, 80 U.S. 679, 722-23, 20 L.Ed. 666 (1871). By contrast, a congregational polity exists where a religious congregation "is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority." *Watson* at 722. If the organization is congregational, then the court determines whether the dispute is ecclesiastical or secular in nature. *Tibbs v. Kendrick*, 93 Ohio App.3d 35, 43, 637 N.E.2d 397 (8th Dist.1994). The court maintains jurisdiction over secular issues. *Id.* at 42. "Generally, the question of who will preach from the pulpit of a church is an ecclesiastical question, review of which by the civil courts is limited by the First and Fourteenth Amendments to the United States Constitution." *Tibbs*, 93 Ohio App.3d at 41, 637 N.E.2d 397 (8th Dist.1994), citing *Kedroff, supra,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952).

20.

**{¶ 38}** In the case sub judice, the parties agree that Mt. Pilgrim Baptist Church is a congregational religious organization. Thus, we must determine whether the issues raised in this case are ecclesiastical or secular in nature.

**{¶ 39}** Appellants argue that this case involves purely secular issues. More specifically, appellants argue that they were not seeking the trial court's determination of who *should* preach from the pulpit, an issue that appellants readily acknowledge is ecclesiastical in nature. Rather, according to appellants, the relief requested in the complaint was limited to the court's enforcement of the Board of Deacons' decision to terminate Bishop's employment pursuant to the Code of Regulations. In other words, appellants argue that they merely requested the court's involvement to enforce church action that had *already* occurred, not to direct the church's actions going forward.

**{¶ 40}** In responding to appellants' argument, Bishop asserts that appellants' complaint consists of ecclesiastical claims tantamount to who should preach from the pulpit. Bishop challenges appellants' distinction between claims involving who *should* preach from the pulpit and claims seeking enforcement of a decision to terminate the pastor that *was previously made* by church authorities. In his brief, Bishop states that the case law does not make such a distinction. Alternatively, Bishop contends that appellants' arguments raise ecclesiastical issues of internal church governance over which the trial court has no jurisdiction.

**{¶ 41}** At the outset, we note that the parties disagree as to what governance documents control the outcome of this case. Having examined the record, we find that

21.

the following scenarios are possible: (1) the Preamble governs; (2) the code of regulations governs; (3) the Church Constitution governs; (4) the Preamble and the code of regulations governs; or (5) the Preamble and the Church Constitution governs.

{¶ 42} In January 2011, the church's code of regulations was "provisionally adopted," granting power to a Board of Deacons (of which appellants' are members) to terminate the church's pastor, a power that was exercised in July 2011. Prior to that time, the church's 1993 Preamble was in effect. Appellants do not specify how the Preamble was affected by the code of regulations, and there was no tally taken of the votes in favor of the code of regulations to determine whether the votes exceeded the two-thirds requirement to amend or repeal the Preamble. Ten months after the vote to provisionally adopt the code of regulations was taken, the Church Constitution was presented to the congregation at an annual meeting. At that meeting, 60.07% of the congregational members in attendance voted to adopt the Church Constitution. Appellants argue that this vote was invalid for a number of reasons.

{¶ 43} The validity of the congregation's vote to adopt the Church Constitution is important, because the adoption of the Church Constitution resolves the chief issue in this case, namely what documents govern the church and who is empowered under those documents to terminate Bishop's employment and assert claims on behalf of the church. Under the Church Constitution, the Board of Ministry Directors possessed such authority. By contrast, under the code of regulations, the Board of Deacons was empowered to make decisions regarding Bishop's employment.

22.

**{¶ 44}** As noted above, the church in this case is congregational in nature. That is, the church is governed by its congregation, which is the supreme authority on issues concerning church government. *Smith v. White*, 7 N.E.3d 552, 2014-Ohio-130, ¶ 29 (2d Dist.), citing *Watson*, *supra*, 80 U.S. at 722-23, 20 L.Ed. 666. Thus, the church, through its congregation, is ultimately responsible for resolving issues of internal church governance.

**{¶ 45}** Appellants characterize this case as one involving only the secular determination of the validity of certain actions previously taken concerning the removal of Bishop. We disagree. Although seemingly secular, we find that the issues in this case concerning the adoption of internal governance documents, the resolution of conflicts in competing governance documents, and the enforcement of action taken to remove a pastor, fall within the ambit of the ecclesiastical abstention doctrine as they essentially relate to who should preach from the pulpit. We conclude that the trial court properly refrained from deciding which governance documents should control the church and whether Bishop was properly terminated. To hold otherwise would lead to trial courts impermissibly interfering with a congregation's autonomy by instructing the church on matters of internal governance. Put simply, the issues present in this case must be resolved by the church, through its congregation.

**{¶ 46}** Accordingly, appellants' assignments of error are not well-taken.

23.

### III. Conclusion

**{¶ 47}** Having found appellants' assignments of error not well-taken, we affirm the judgment of the Lucas County Court of Common Pleas. Costs are hereby assessed to appellants in accordance with App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Stephen A. Yarbrough, P.J.

_____
JUDGE

James D. Jensen, J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.